THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICHARD L. KIPFER, Defendant-Appellant.

Second District No. 2—03—0631

Opinion filed March 10, 2005.

GILLERAN JOHNSON, J., dissenting.

G. Joseph Weller and Jack Hildebrand, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph E. Birkett, State's Attorney, of Wheaton (Lawrence M. Bauer and Joseph S. Mikula, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KAPALA delivered the opinion of the court:

Defendant, Richard L. Kipfer, appeals the circuit court of Du Page County's denial of his motion to quash arrest and suppress evidence and his subsequent conviction of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2002)). We conclude that the arresting police officer did not have a reasonable, articulable suspicion that defendant was about to commit a crime sufficient to justify an investigative stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Consequently, the cocaine discovered as a result of that unlawful seizure should have been suppressed. Because on remand the State would be unable to prove that defendant committed the offense of unlawful possession of a controlled substance without the suppressed cocaine, we reverse defendant's conviction and sentence.

## I. BACKGROUND

Defendant was charged with unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2002)) and unlawful possession of drug paraphernalia (720 ILCS 600/3.5(a) (West 2002)). Defendant filed a pretrial motion to quash arrest and suppress evidence, alleging that the police officer seized him without probable cause to arrest or a reasonable, articulable suspicion that he had committed a crime. Defendant further alleged that the seized contraband was the product

of the unreasonable search and seizure and, therefore, was inadmissible pursuant to the exclusionary rule.

At the hearing on his motion, defendant called Officer Biecker of the Downers Grove police department. At about 3:30 a.m. on December 22, 2002, Officer Biecker entered the Autumn Grove apartment complex while on patrol in a fully marked squad car. As Officer Biecker drove through the parking lot, he saw defendant come out from behind a Dumpster and walk behind his squad car. Officer Biecker looked into his rearview mirror and saw defendant walking away. Officer Biecker said that "[d]ue to the apartment complex having a lot of car burglaries, thefts, burglaries, robberies in that particular apartment complex, I thought it was kind of odd that at 3:30 in the morning somebody was walking through the parking lot or coming out from behind a [D]umpster." Officer Biecker turned his squad car around so that it was directly behind defendant, and he honked the horn at defendant two times. Defendant kept walking in front of the patrol car and did not respond or turn around. Officer Biecker got out of his squad car and asked defendant to stop. Defendant turned and looked back at Officer Biecker and then kept walking. Officer Biecker took two steps toward defendant and said something to the effect of "come here." Officer Biecker said that defendant stopped and reluctantly walked back toward him. Officer Biecker testified that defendant had a McDonald's apple pie box in his hand. When asked if he had seen defendant do anything illegal, Officer Biecker said, "[n]ot illegal, but suspicious that he was coming out from behind a [D]umpster at that time of night." Officer Biecker asked defendant where he was headed, and defendant said to a girlfriend's apartment and pointed in a northwest direction. When Officer Biecker asked defendant where the apartment was, defendant said he did not know. Officer Biecker asked defendant what his business was and if he lived in the area. Defendant said that he lived in one of the apartments. When Officer Biecker asked defendant for the address, defendant could not provide one. At that point, Officer Biecker asked defendant for identification and defendant produced an identification with a Downers Grove address approximately two miles away from the apartment complex. Officer Biecker repeatedly asked defendant what his business was at the apartment complex and defendant "kind of shut down" and did not want to answer any more questions. After obtaining defendant's identification, Officer Biecker told defendant that he was going to pat him down for weapons. Defendant placed his wallet and the McDonald's apple pie box on the squad car. When asked whether there was anything about defendant that indicated that he had a weapon, Officer Biecker said, "[j]ust his answers to my questions. They were

simple questions. He couldn't come up with any of those questions, which led to my suspicion that he might have been out their [*sic*] burglarizing cars or looking to either rob or assault someone." Officer Biecker also said that defendant was wearing a bulky winter jacket.

As Officer Biecker began patting down defendant, he located what felt like a five- or six-inch object in defendant's back pocket. Officer Biecker asked defendant what it was and defendant said he did not know. Initially, Officer Biecker thought it was a center punch used to shatter windows in vehicles. As Officer Biecker began to manipulate the object, he discovered that it had two blunt ends and, based on his experience, he knew that such an object could be used as a crack pipe. Officer Biecker removed the object from defendant's pocket, placed it in his own pocket for safekeeping, and continued to search defendant for weapons. Officer Biecker placed defendant under arrest for possession of drug paraphernalia. Officer Biecker collected the items defendant placed on top of the squad car and found, within the apple pie box, a partially consumed apple pie and a sizable white chunk in the apple pie. Later, at the police station, a field test on the white chunk indicated the presence of cocaine.

On cross-examination by the State, Officer Biecker said that the parking lot at the apartment complex is very well lit such that the fully marked squad car that he drove on the morning in question would be easily identifiable. Officer Biecker said that there were three reported vehicle burglaries in the apartment complex's parking lot during the month preceding defendant's arrest. Officer Biecker estimated that, in the three years that he had been employed by the Downers Grove police department, he was at the apartment complex in question twice a week, taking reports of thefts, burglaries, car burglaries, or other complaints. While there were no other pedestrians in the parking lot on the morning in question, Officer Biecker did observe another vehicle that pulled into the lot just before he did. Officer Biecker testified that in his experience, car burglars use screwdrivers and center punches. Officer Biecker said that a center punch could hurt someone if it were used as a weapon.

After hearing the arguments of counsel, the trial court denied defendant's motion. The trial court held that the *Terry* stop was proper because defendant was observed at 3:40 a.m., walking out from behind a Dumpster in a parking lot that the officer described as a high-crime area. The trial court found it significant that there had been three car burglaries in the parking lot in the previous month. Next, the trial court determined that the pat-down for weapons was reasonable under the circumstances, in light of defendant's answers to the officer's questions and because, in the officer's experience, car burglars often

possess objects that could be used as weapons. The trial court also held that removal of the pipe from defendant's pocket was justified because the officer came to the conclusion that it was a crack pipe while he manipulated the object in order to determine if it was a weapon. Finally, the trial court held that, with the removal of the pipe from defendant's pocket, Officer Biecker obtained probable cause to arrest defendant and that the search of the pie box revealing the cocaine was a lawful search incident to that arrest.

Thereafter, defendant waived his right to trial by jury, the State dismissed the possession of drug paraphernalia charge, and the parties proceeded to a stipulated bench trial on the unlawful possession of a controlled substance charge. The trial court found defendant guilty. After denying defendant's motion for a new trial, the trial court sentenced defendant to a 24-month period of probation. Defendant timely appeals.

## II. ANALYSIS

Defendant contends that the trial court erred in denying his motion to quash arrest and suppress evidence. Defendant also contends that the evidence presented at the stipulated bench trial was insufficient to prove him guilty beyond a reasonable doubt. We agree with defendant's first contention and, therefore, do not reach the second.

In reviewing a trial court's ruling on a motion to suppress, we may reverse the trial court's findings of historical fact only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 430-31 (2001). However, we must review *de novo* the ultimate conclusion of the trial court as to the existence of probable cause or reasonable suspicion. *Sorenson*, 196 Ill. 2d at 431. Also, when there is no dispute as to the facts or as to witness credibility, the standard of review is *de novo*. *People v. Dilworth*, 169 Ill. 2d 195, 201 (1996). In this case the facts are not in dispute. Defendant challenges the trial court's ultimate legal conclusions that the investigatory stop and the subsequent search were justified. Consequently, our review is *de novo*.

Defendant argues that the investigatory stop, the frisk for weapons itself, and the scope of the frisk violated his constitutional rights. Defendant argues that the discovery of the cocaine was the fruit of that illegality and, therefore, the cocaine should have been suppressed. Because we conclude that the facts known to Officer Biecker at the time he initiated the investigatory stop did not provide a reasonable, articulable suspicion that defendant had or was about to commit a crime, we hold that the *Terry* stop violated defendant's constitutional rights. Consequently, we need not reach defendant's arguments regarding the protective frisk.

Both the fourth amendment to the United States Constitution and article I, section 6, of the Illinois Constitution protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. Defendant cites both the United States and the Illinois Constitutions in his brief but makes no specific argument that the Illinois Constitution should provide broader protection than that of the fourth amendment. With one exception not relevant here (*People v. Krueger*, 175 Ill. 2d 60, 75-76 (1996)), our supreme court has held that the fourth amendment provides the same level of protection as the search and seizure provision of article I, section 6, of the Illinois Constitution. *People v. Tisler*, 103 Ill. 2d 226, 241 (1984). Thus, we measure the protection afforded to defendant under both constitutional provisions using the same standard. See *Tisler*, 103 Ill. 2d at 235-36.

■ In *Terry*, the Supreme Court held that a police officer may stop and question an individual only when the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry*, 392 U.S. at 30, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884. The police must have a reasonable, articulable suspicion that a person has committed or is about to commit a crime, to justify stopping that person. *Terry*, 392 U.S. at 22, 20 L. Ed. 2d at 906-07, 88 S. Ct. at 1880. To justify an investigatory stop, the police officer must be able to point to specific and articulable facts that, taken together with rational inferences therefrom, reasonably warrant the intrusion. *Terry*, 392 U.S. at 20-21, 20 L. Ed. 2d at 905-06, 88 S. Ct. at 1879-80. The *Terry* standards have been codified in our Code of Criminal Procedure of 1963:

"§ 107—14 Temporary Questioning without Arrest. A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense as defined in Section 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped." 725 ILCS 5/107—14 (West 2002).

Our supreme court has further defined the requisite suspicion to support an investigatory stop pursuant to *Terry* principles:

"Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly. The facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch. The facts should not be viewed with analytical hindsight, but instead should be considered

from the perspective of a reasonable officer at the time that the situation confronted him or her." *People v. Thomas*, 198 Ill. 2d 103, 110 (2001).

■ The facts relevant to our analysis of the propriety of the investigatory stop, that is, those facts known to Officer Biecker at the time of the *Terry* stop, are not in dispute. At approximately 3:40 a.m., Officer Biecker drove his marked squad car through the parking lot of the Autumn Grove apartment complex, which had been the scene of three car burglaries in the previous month. As the squad car passed a Dumpster, defendant came out from behind that Dumpster and walked in the direction opposite to the direction the squad car was traveling. Officer Biecker turned his squad car around and, after making several attempts to get defendant to stop, including sounding the horn twice, asking defendant to stop, and telling defendant to "come here," defendant finally complied.

Defendant argues that the trial court erred in denying his motion to quash arrest and suppress evidence because, based on the foregoing facts articulated by Officer Biecker, the seizure of his person was not justified as a valid *Terry* stop. In response, the State argues that the foregoing facts gave Officer Biecker reasonable suspicion to conclude that defendant was about to commit a crime. We agree with defendant.

Officer Biecker's observations of defendant, articulated at the hearing on defendant's motion, establish nothing more than innocuous behavior on defendant's part and do not support a reasonable suspicion that defendant was about to burglarize a vehicle in the parking lot. Defendant's presence in an area where criminal activity was common, and where three car burglaries had occurred in the previous month, does not, without more, support a reasonable suspicion that he was about to burglarize a vehicle on the morning in question. "An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 676 (2000). The individual's location is "among the relevant contextual considerations in a *Terry* analysis," but it is not enough, by itself, to support a valid stop. *Wardlow*, 528 U.S. at 124, 145 L. Ed. 2d at 576, 120 S. Ct. at 676. There was nothing suspicious about defendant's mere presence in the parking lot at a late hour, and no facts articulated by Officer Biecker distinguished defendant from an innocent resident of the apartment complex, a guest of a resident, or a mere passerby.

The lateness of hour may be a factor contributing to a reasonable suspicion. *People v. Smith*, 331 Ill. App. 3d 1049, 1054 (2002). However, this factor contributes to suspicion of criminal activity only when

there is no legitimate basis for an individual to be in the location at such an hour. See *People v. McGowan*, 69 Ill. 2d 73, 78 (1977) (valid *Terry* stop of suspects wearing black clothes emerging from industrial area at 12:50 a.m.; area had suffered a number of burglaries); *People v. Ellis*, 113 Ill. App. 3d 314, 317-18 (1983) (valid *Terry* stop of suspects observed walking through parking lot of shopping center at 1:25 a.m. when all the stores were closed and burglaries were common in the neighborhood). The fact that defendant was observed in the early morning hours in this case adds little suspicion that he was about to engage in criminal activity. It cannot be argued that residents of an apartment complex and their visitors do not innocently walk through the parking lot at all hours to get to and from their vehicles. In fact, Officer Biecker testified that a vehicle pulled into the parking lot just before he did.

The State stresses the suspiciousness of defendant's conduct. Specifically, the State argues that the timing of defendant's emergence from behind the Dumpster and his walking away just after Officer Biecker drove by in a highly visible squad car suggests that defendant was being evasive and was attempting to leave the area when he saw the police arrive. We come to the opposite conclusion. If defendant were attempting to evade the police, upon seeing the squad car he would have remained behind the Dumpster rather than emerge as the squad car passed. Moreover, the mere fact that defendant emerged from behind a Dumpster, without more, does not raise a suspicion of criminal activity. The evidence presented by the State at the hearing on the motion did not establish where in the apartment complex parking lot the Dumpster was located. As such, we cannot conclude that defendant's emergence from behind the Dumpster indicated an attempt by defendant to conceal himself, or was anything other than a consequence of the Dumpster being in such a location that it incidentally blocked the officer's view of defendant as defendant proceeded along his way.

With respect to defendant walking away from the officer when asked to stop, it is important to note that defendant's actions that occurred after the officer's requests and before defendant yielded to the officer's command to "come here" are properly considered in determining whether reasonable suspicion of criminal activity existed. However, in this case, defendant's conduct after he was asked to stop but before he did so did not suggest that he was engaged in criminal activity. This case did not involve unprovoked, "headlong flight" upon noticing the police, as in *Wardlow*, where such flight, along with other facts, justified the *Terry* stop of the defendant. *Wardlow*, 528 U.S. at 124, 145 L. Ed. 2d at 576, 120 S. Ct. at 676 ("Headlong flight—

wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such"). Rather, defendant's conduct in the face of Officer Biecker's requests that he stop was consistent with defendant's choice to exercise his right to ignore those requests and to go about his business. In *Wardlow*, the Supreme Court explained that its holding therein was consistent with an individual's right to go about his business when confronted by a police officer lacking reasonable suspicion or probable cause to detain him, and distinguished flight from merely going about one's business:

"Such a holding is entirely consistent with our decision in *Florida v. Royer*, 460 U.S. 491[, 75 L. Ed. 2d 229, 103 S. Ct. 1319] (1983), where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. *Id.*, at 498[, 75 L. Ed. 2d at 236, 103 S. Ct. at 1324]. And any 'refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.' *Florida v. Bostick*, 501 U.S. 429, 437[, 115 L. Ed. 2d 389, 400, 111 S. Ct. 2382, 2387] (1991). But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning." *Wardlow*, 528 U.S. at 125, 145 L. Ed. 2d at 577, 120 S. Ct. at 676.

In *Thomas*, our supreme court also recognized this right where, after holding that the defendant's flight induced by the officer's effort to effectuate an unwarranted investigatory stop ultimately justified the ensuing pursuit and investigatory stop (*Thomas*, 198 Ill. 2d at 112-13), the court wrote:

"[T]his holding is not a license to conduct investigatory stops in every case where a citizen ignores, or fails to heed, a baseless police order or show of authority. '[P]eople do have a right to go about their business, and if they choose to do so, their choice does not authorize a subsequent stop and detention.' " *Thomas*, 198 Ill. 2d at 114, quoting *People v. Thomas*, 315 Ill. App. 3d 849, 858 (2000), citing *Florida v. Royer*, 460 U.S. 491, 497-98, 75 L. Ed. 2d 229, 236, 103 S. Ct. 1319, 1324 (1983).

Based on the foregoing authority, we cannot conclude that Officer Biecker's scant suspicion or hunch about defendant ripened into a reasonable suspicion that defendant was about to burglarize a vehicle, rob or assault someone, simply because defendant continued to walk away while Officer Biecker sounded his horn and asked defendant to stop.

The State also claims that the facts in *People v. McGowan*, 69 Ill. 2d 73 (1977), are analogous to those in this case and that the holding in *McGowan* supports its position that the investigatory stop of defendant was justified. *McGowan*, however, is readily distinguishable from this case because the officer in *McGowan* had more justifiable suspicion that a burglary had been or was about to be committed than did Officer Biecker in this case.

In *McGowan*, a police officer observed two men wearing black clothing emerge from a commercial and industrial area at 12:50 a.m. *McGowan*, 69 Ill. 2d at 75-76. The officer testified that he stopped the men because their black clothing, the hour of night, and his knowledge of the area had led him to conclude that the men either had just committed or were about to commit a burglary. *McGowan*, 69 Ill. 2d at 76. In support of his conclusion, the officer testified that, although he had received no reports of burglaries in the previous few hours, he knew from having patrolled the area many times that it was a commercial and industrial area that had suffered a number of burglaries. *McGowan*, 69 Ill. 2d at 76. The officer also testified that it was unusual to see people in that area at that time of night, with the possible exception of hitchhikers, but that the defendant did not appear to have been hitchhiking. *McGowan*, 69 Ill. 2d at 76. The officer admitted that there was a tavern that was open until 1 a.m. located two blocks from where he stopped the defendant and that the defendant was headed in the general direction of the tavern when stopped. *McGowan*, 69 Ill. 2d at 76.

In addressing whether it was reasonable for the officer to infer that the defendant had committed or was about to commit a burglary, the court in *McGowan* wrote:

"While this is admittedly a close case, we agree with the appellate and circuit courts that the State has met its burden of proof on this question. On Sunday at 12:50 a.m. when [the officer] first spotted the defendant, Penn's Tavern apparently was the only business establishment open in this otherwise deserted commercial and industrial area. The defendant and his companion were about two blocks away from the tavern, which was due to close in 10 minutes, leaving them barely enough time to reach the tavern and have a fast drink. It therefore would have appeared somewhat unlikely that the suspects were on their way to the tavern. It also appeared unlikely that they were hitchhiking. Thus, on the basis of his experience patrolling the area, [the officer] knew that the suspects were in an unlikely place at an unlikely time.

· [The officer] also knew that the suspects' black clothing would have been highly unusual for persons merely walking down the street at night, but not at all unusual if the suspects were engaged

in some kind of surreptitious activity. [The officer] knew of at least one form of surreptitious activity that unfortunately was not uncommon in this neighborhood[,] burglary. Thus, while it is possible that the defendant and his companion were merely on their way to Penn's Tavern to have a fast drink before closing time, we agree that it was much more likely that persons dressed in black, walking in the dead of night through an otherwise deserted commercial and industrial area which had been plagued by burglaries, had just committed or were about to commit a burglary. Under these circumstances, the suspects easily might have eluded the officers had the officers attempted to observe the two suspects further rather than stopping them immediately. Hence, we agree that [the officer's] inference of an imminent or recent burglary was reasonable, and that stopping the defendant therefore was reasonable under the circumstances." *McGowan*, 69 Ill. 2d at 78-79.

The State asserts that, although it is possible that defendant was merely walking to his girlfriend's house as he suggested, it is much more likely that a person walking at 3:30 a.m. through an otherwise deserted parking lot of an apartment complex, in an area that had been plagued by burglaries, had just committed or was about to commit a car burglary. We disagree.

Officer Biecker articulated no facts to support his suspicion that defendant had burglarized or was about to burglarize a vehicle. Unlike the facts articulated in *McGowan* supporting a suspicion that the defendant in that case had committed or was about to commit a burglary, Officer Biecker articulated no facts that support a suspicion that defendant was a burglar and not an innocent pedestrian who happened to be in an area of expected criminal activity at a late hour. In *McGowan* the high-crime area was an industrial and commercial area, a place where legitimate pedestrian traffic would be very limited at 12:50 a.m. In contrast, pedestrian traffic in a parking lot of a residential apartment complex may be lighter at off hours, but it is not unusual. Unlike the defendant in *McGowan*, this defendant was not in an unlikely place at an unlikely time. Additionally, the officer in *McGowan* testified that the defendant and his companion were dressed in black, which the *McGowan* court determined "would have been highly unusual for persons merely walking down the street at night, but not at all unusual if the suspects were engaged in some kind of surreptitious activity." *McGowan*, 69 Ill. 2d at 78. Here, Officer Biecker testified that defendant was wearing a bulky winter jacket, but he did not indicate that the jacket was black or otherwise could aid surreptitious activity. In sum, the facts articulated by Officer Biecker, in contrast to those articulated by the officer in *McGowan*, did not support a conclu-

sion other than that defendant was innocently walking through the parking lot.

## III. CONCLUSION

Having determined that the *Terry* stop of defendant was illegal, we conclude that the trial court should have granted defendant's motion and excluded all evidence obtained as a result of that illegality, including the cocaine discovered in the apple pie box. See *Mapp v. Ohio*, 367 U.S. 643, 649, 6 L. Ed. 2d 1081, 1086, 81 S. Ct. 1684, 1688 (1961) (pursuant to exclusionary rule, courts are precluded from admitting evidence that is gathered by government officers in violation of the fourth amendment); *People v. Winsett*, 153 Ill. 2d 335, 341 (1992), citing *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963) (fruit of the poisonous tree doctrine may be invoked to suppress evidence obtained through violation of defendant's constitutional rights). The State does not argue, in the event that we find the *Terry* stop of defendant illegal, that any exception to the fruit of the poisonous tree doctrine or to the exclusionary rule is applicable here. For these reasons, the judgment of the circuit court of Du Page County denying defendant's motion to quash arrest and to suppress evidence is reversed. Because the State would be unable to prove beyond a reasonable doubt that defendant unlawfully possessed a controlled substance without the suppressed cocaine, we reverse outright defendant's conviction and sentence. See *People v. Merriweather*, 261 Ill. App. 3d 1050, 1056 (1994).

Reversed.

BYRNE, J., concurs.

JUSTICE GILLERAN JOHNSON, dissenting:

I respectfully dissent. Under the circumstances in the present case, I believe that the investigatory stop of the defendant was reasonable. Additionally, the subsequent pat-down search of the defendant was proper and did not exceed the scope of *Terry*.

The majority has correctly stated the standard of review of a trial court's ruling on a motion to suppress. We may reverse the trial court's findings of historical fact only if they are against the manifest weight of the evidence. *Sorenson*, 196 Ill. 2d at 430-31. However, we review *de novo* the ultimate conclusion as to the existence of probable cause or reasonable suspicion. *Sorenson*, 196 Ill. 2d at 431.

In the present case, the trial court found that the *Terry* stop was justified based on (1) the defendant walking out from behind a Dump-

ster at 3:30 in the morning and (2) the officer's "clear" testimony that this was a high-crime area, that there had been three car burglaries in this area in the previous month, and that he had been at the apartment complex on numerous occasions for various crimes. Additionally, the trial court found that the pat-down of the defendant was reasonable under the circumstances. In so ruling, the trial court emphasized that the defendant was unable to indicate where he was going or where he lived. Furthermore, Officer Biecker testified that in his experience, car burglars often have objects that can be used as weapons. The trial court found this testimony to be particularly "credible."

Finally, the trial court determined that the pat-down of the defendant did not exceed the bounds of a *Terry* stop. Again, the trial court emphasized the credibility of Officer Biecker's testimony. The trial court noted that Officer Biecker testified that he felt in the defendant's pocket an object that was about five to six inches long, and in attempting to determine whether it was a weapon, he determined, based on his experience, that it was drug paraphernalia. The trial court found that, at that point, Officer Biecker was justified in removing the crack pipe from the defendant's pocket because he reasonably believed it to be drug paraphernalia. Furthermore, the trial court noted:

> "It's not as though he concluded that it wasn't a weapon and he continued to search, but it was in determining whether or not the object was, in fact, a weapon which could be used against him that he came to the conclusion that it was drug paraphernalia."

As such, it is clear that the trial court believed that the *Terry* stop and pat-down were justified by a reasonable suspicion of criminal activity and a reasonable concern for the safety of the officer. A reviewing court must accord great deference to the trial court's factual findings and credibility determinations. *People v. Davis*, 352 Ill. App. 3d 576, 579 (2004). This deferential standard is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony. *Sorenson*, 196 Ill. 2d at 431. Accordingly, based on the record before us, the trial court's findings, and its determination that Officer Biecker's testimony was clear and credible, are not against the manifest weight of the evidence.

Nonetheless, the ultimate conclusion of the trial court, as to the existence of probable cause or reasonable suspicion, is reviewed *de novo*. *Sorenson*, 196 Ill. 2d at 431. To justify an investigatory stop, the police officer must be able to point to specific and articulable facts that, taken together with rational inferences therefrom, reasonably

warrant the intrusion. *Terry*, 392 U.S. at 20-21, 20 L. Ed. 2d at 905-06, 88 S. Ct. at 1879-80. The facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her. *People v. White*, 331 Ill. App. 3d 22, 27 (2002); *People v. Thomas*, 198 Ill. 2d 103, 110 (2001). In evaluating the validity of an investigatory stop, the court must consider the totality of the circumstances. See *United States v. Sokolow*, 490 U.S. 1, 8, 104 L. Ed. 2d 1, 10, 109 S. Ct. 1581, 1585 (1989). " '[A]n objective standard is used in determining whether the facts and circumstances known to the officer at the time of the stop would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity. [Citations.]' " *People v. Chavez*, 327 Ill. App. 3d 18, 31-32 (2001).

In the present case, at the hearing on the defendant's motion, Officer Biecker articulated specific facts that reasonably warranted the investigatory stop. First, Officer Biecker testified that the defendant emerged from behind a Dumpster in the parking lot of an apartment complex at 3:30 a.m. The majority states that the evidence presented at the hearing did not establish where the Dumpster was located within the apartment complex parking lot. Consequently, the majority declined to conclude whether the defendant had suspiciously used the Dumpster to conceal himself or whether the defendant's emergence from behind the Dumpster was merely a consequence of the Dumpster being in a location that incidentally blocked the officer's view of the defendant as the defendant proceeded along his way. However, Officer Biecker specifically testified that the Dumpster was located at the corner of the 2035 building, next to the parking lot. Officer Biecker further testified that he is very familiar with this area of the apartment complex. Finally, Officer Biecker testified that he believed it was "suspicious that [the defendant] was coming out from behind the [D]umpster at that time of night." As such, contrary to the majority, I believe that Officer Biecker's testimony, concerning his familiarity with the apartment complex and his belief that the defendant's emergence from behind the Dumpster was suspicious, adequately supports a conclusion that the defendant's conduct was suspicious. See *White*, 331 Ill. App. 3d at 27 (the facts should be viewed from the perspective of a reasonable officer at the time that the situation confronted him).

In addition to his testimony concerning the defendant's suspicious emergence from behind the Dumpster, Officer Biecker testified that there was a history of car burglaries, thefts, burglaries, and robberies in the apartment complex. Officer Biecker testified that in the previous three years, he had been at the apartment complex twice a week

taking reports of thefts and burglaries and other complaints. He also testified that there were three reported vehicle burglaries in that parking lot during the month preceding the defendant's arrest. Based on these facts, Officer Biecker testified that he believed that the defendant may have been in the area to commit a burglary. The trial court found the officer's testimony to be "clear" on these issues. Although the defendant may have been an innocent resident or visitor of the apartment complex, the unusual hour of the day, the defendant's emergence from behind a Dumpster, and his presence in a high-crime area created an objectively reasonable suspicion that the defendant either had just committed or was about to commit a burglary. See *Chavez*, 327 Ill. App. 3d at 31-32. As such, the investigatory stop of the defendant was reasonable under the circumstances. See *People v. Lockett*, 311 Ill. App. 3d 661, 667 (2000) (police officer may conduct a brief investigatory stop when he has a reasonable, articulable suspicion that the person he is stopping is about to commit or has committed a crime).

Additionally, the pat-down search of the defendant was proper. Under *Terry*, when an officer is justified in believing that the individual whose suspicious behavior he is investigating is armed and presently dangerous to the officer or other persons, the officer may conduct a pat-down search to determine whether the person is in fact carrying any weapons. *Sorenson*, 196 Ill. 2d at 432. In the present case, the defendant exhibited suspicious behavior. The defendant emerged from behind a Dumpster at an unusual hour. When Officer Biecker honked his horn at the defendant, the defendant continued walking in front of the patrol car without responding or turning around. Officer Biecker then exited his squad car and asked the defendant to stop. However, the defendant merely looked at Officer Biecker and continued walking. Next, Officer Biecker told the defendant to "come here," at which time the defendant reluctantly walked toward the officer. When Officer Biecker asked the defendant where he was going, the defendant did not have any reasonable responses. At first, the defendant told Officer Biecker that he was going to his girlfriend's apartment, but he was unable to provide a location. Then, the defendant said that he lived in one of the apartments in the complex, but he was unable to provide an address. Finally, when the defendant produced identification, it indicated that he lived approximately two miles away from the apartment complex. Officer Biecker repeatedly asked the defendant what legitimate business he had at the apartment complex, and the defendant did not respond.

Furthermore, Officer Biecker was justified in believing that the defendant was armed and presently dangerous. Officer Biecker testi-

fied that there were many car burglaries, thefts, burglaries, and robberies in the apartment complex at issue. Officer Biecker testified that in his experience, burglars often carry tools or weapons with them, such as screwdrivers or center punches. He further testified these tools could be used as stabbing devices. Thus, it was reasonable for Officer Biecker to believe that he or others may be in danger. See *McGowan*, 69 Ill. 2d at 79 (officer justified in believing the defendant was armed and dangerous because it was likely that a person engaged in stealing another's property would arm himself against the possibility that another person would appear unexpectedly and object). Moreover, the trial court specifically found Officer Biecker's testimony that he was concerned for his safety to be "credible." As such, the defendant's suspicious behavior, coupled with the officer's reasonable belief that car burglars often possess objects that can be used as weapons, justified the pat-down search of the defendant. See *McGowan*, 69 Ill. 2d at 78-79 (pat-down for weapons proper due to suspicious behavior and reasonable belief that the defendant was armed and dangerous).

Finally, the pat-down of the defendant did not exceed the bounds of *Terry*. A *Terry* search is strictly limited to only what is necessary for the discovery of weapons that might harm the officer. *People v. Pratcher*, 332 Ill. App. 3d 1063, 1067 (2002). If the search goes beyond those limits, it is no longer valid under *Terry* and its fruits will be suppressed. *Pratcher*, 332 Ill. App. 3d at 1067. As stated by our supreme court in *People v. Mitchell*, 165 Ill. 2d 211 (1995):

> "[N]ot even all weapons are of easily discernable shape, particularly when covered by a layer of heavy clothing. However, in the context of a *Terry* stop and frisk, where an officer's training and experience have led him reasonably to conclude that a perceived object is a weapon, seizure of that object has been upheld as valid. [Citations.] It is the officer's 'plain touch' of the object which elevates his reasonable suspicion that the suspect might be armed to the necessary probable cause to believe that the suspect is concealing a weapon. [Citation.]
>
> The same may be said of the officer's tactile perception of contraband. When objects have a distinctive and consistent shape that an officer has been trained to detect and that officer has had previous experience in detecting such objects, his tactile perceptions can provide him with the same recognition that his sight would have provided. [Citations.] We caution that the officer's belief must be objectively reasonable, in light of his past experience and training, and capable of verification. [Citation.] However, probable cause is probable cause, regardless of whether it develops from sight or touch." *Mitchell*, 165 Ill. 2d at 227.

However, the "plain touch" doctrine "does not permit the search to exceed the initial intrusion. As soon as the officer is satisfied that an object is not a weapon, a further search to determine the nature or identity of that object is impermissible." *Mitchell*, 165 Ill. 2d at 228. Illinois courts have frequently noted that objects that are not *per se* deadly weapons may be used in such a manner as to become deadly weapons. *People v. Day*, 202 Ill. App. 3d 536, 544 (1990), citing *People v. Carter*, 410 Ill. 462, 465 (1951), and *People v. Van*, 136 Ill. App. 3d 382, 384 (1985).

Applying these principles to the present case, the requirements for a seizure under the "plain touch" doctrine were met, and Officer Biecker's seizure of the crack pipe was proper. Officer Biecker testified that, upon feeling the object in the defendant's pocket, he thought the item was potentially a center punch, which could be used as a weapon. Under *Terry*, it was proper for Officer Biecker to manipulate the object in the defendant's pocket in order to determine if it was a weapon or something that could be used as a weapon. In the process of determining whether it was a weapon, Officer Biecker determined that the item was a crack pipe. The trial court found this testimony "clear and credible." As such, under the "plain touch" doctrine, it was proper for Officer Biecker to remove the crack pipe from the defendant's pocket. See *Mitchell*, 165 Ill. 2d at 227.

The defendant argues, however, that Officer Biecker could not have immediately identified the object in his pocket as a crack pipe because he asked the defendant what the item was before he removed it. This argument is without merit. Officer Biecker testified that based on his experience and what he felt, the item was a crack pipe. The fact that Officer Biecker asked the defendant to identify the object, to possibly verify what the object was, does not change the fact that Officer Biecker's sense of touch gave him probable cause to believe that the item was illegal drug paraphernalia. Moreover, when Officer Biecker asked the defendant what the object was, the defendant said that he did not know. Based on the defendant's response, it was proper under *Terry* for Officer Biecker to remove the item from the defendant's pocket to determine if it was a weapon or something that could be used as a weapon. See *Day*, 202 Ill. App. 3d 543-44.

Accordingly, upon removing the crack pipe from the defendant's pocket, Officer Biecker had probable cause to arrest the defendant for possession of drug paraphernalia. The search of the McDonald's apple pie box was proper as a search incident to arrest. The crack cocaine found in the pie box was lawfully obtained, and the trial court properly denied the defendant's motion to quash and suppress.

Additionally, I note that, contrary to the majority, I do not find

*McGowan* distinguishable from the instant case. The majority attempts to distinguish *McGowan* on several grounds. The majority states that contrary to the officer in *McGowan*, Officer Biecker articulated no facts to support a suspicion that the defendant had just committed or was about to commit a burglary. However, Officer Biecker testified that the defendant emerged from behind a Dumpster at an unusual hour in the parking lot of an apartment complex plagued by crime. These facts are sufficient to support a suspicion that the defendant had just committed or was about to commit a crime. Furthermore, the majority distinguishes *McGowan* because the defendants in that case were walking in an industrial and commercial area. Since the defendant in the present case was in the parking lot of a residential apartment complex, the majority believes that the defendant was not in an unlikely place at an unlikely time. On the contrary, I believe that emerging from behind a Dumpster at 3:30 a.m. in a deserted parking lot of an apartment complex establishes that the defendant was in an unlikely place at an unlikely time. Finally, *McGowan* is not distinguishable on the mere fact that the officers in that case testified that the defendants were dressed in black, indicative of involvement in some kind of surreptitious activity. In the present case, although Officer Biecker did not testify that the defendant was dressed in black, he did testify that the defendant was wearing a bulky winter jacket. Although this could be innocent as the arrest occurred in December, the bulky jacket could also indicate that the defendant was trying to conceal weapons that could be used to carry out a theft or burglary. As such, contrary to the majority, I believe that the holding in *McGowan* supports the conclusion that the trial court properly denied the defendant's motion to quash arrest and suppress evidence.

For the foregoing reasons, I would affirm the judgment of the trial court.