**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 220456-U

Order filed January 16, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0456 Circuit No. 21-CM-975 |
| | ) | |
| BRANDON L. TATUM, | ) ) | Honorable Chrystel L. Gavlin, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The State presented insufficient evidence to convict the defendant of resisting a peace officer.

¶ 2     The defendant, Brandon L. Tatum, appeals his conviction of resisting a peace officer, arguing that the evidence was insufficient to find him guilty beyond a reasonable doubt.

¶ 3                                I. BACKGROUND

¶ 4        The State charged the defendant by information with resisting a peace officer (720 ILCS 5/31-1(a), (a-5) (West 2020)) in that he knowingly resisted "a peace officer engaged in the execution of his official duties" when the defendant "pulled his arm away during handcuffing." The matter proceeded to a jury trial.

¶ 5        Officer Noe Mozo testified that on May 11, 2021, he was being field trained by Officer Antwane Windmon for the Metra Commuter Agency while they patrolled the Metra stations. General patrol duties included checking for "property damage, people sleeping inside the shelters, and just anything that can be considered foul play." At approximately 2 a.m., Mozo noticed a man sleeping on a bench at the Joliet station while on his way to another station. Mozo did not stop at that time. Approximately 30 or 40 minutes later, Mozo returned and observed "the same individual sleeping on the same bench in the same form." The defendant was lying on a bench with a blanket covering his feet to his neck. When Mozo inquired why the defendant was at the station, the defendant responded that he did not "have to tell" Mozo anything. The defendant refused to provide his identification after multiple requests. Mozo also requested several times that the defendant show his hands, which the defendant refused. Mozo explained that whether he could "see a person's hands" is a matter of officer safety. Based on the defendant's "non-compliance," the officers went "hands on" and "plac[ed]" the defendant on the ground. Mozo was unable to gain control of the defendant's left arm, which was "tucked *** under [the defendant's] chest," and the defendant was "very tense" and "kept pulling away." Eventually, Windmon forced the defendant's compliance by using a taser.

¶ 6        On cross-examination, Mozo indicated that he could not identify the defendant as the person lying on the bench when he first passed the station. Mozo testified that the train station was a known location for loitering and trespassing. However, the station did not have any no trespass

signs or notices, the officers gave no verbal orders to the defendant to vacate the premises, and they had not received any complaints about the defendant trespassing. Mozo explained that "[t]he whole point of *** making contact was to gain experience seeing that I was a relatively new officer, and the intention was to *** inform [the defendant] that he couldn't be at the station." Mozo acknowledged that potential patrons must be on the platform to board the train. Counsel asked if Mozo had "any reason to believe that there was a weapon underneath" the defendant's blanket. Mozo stated, "[w]e asked him to see his hands. Normally people that aren't hiding anything or don't have anything usually show me their hands." Mozo also stated that "the way that [the defendant] was conducting himself *** alerted [Mozo] and alerted *** Windmon that [the defendant's] hands were underneath the blanket." Following a search of the defendant and his items, the officers did not locate any weapons.

¶ 7        Windmon testified that he approached the defendant for a trespassing investigation because the station was closed and the trains were not running. Upon contact, the officers asked the defendant to sit up and show his hands for officer safety and to "make sure he didn't have any weapons." Windmon explained that the officers

> "didn't know what was under the [blanket]. [The defendant] could have had a weapon, a gun. It could have been anything. So just to make sure he didn't have anything, we wanted to see his hands, *** have him sit up and we could have a full view of his body."

The defendant refused after multiple requests. Windmon described the defendant as "very hostile[,]" "avoiding questions, cursing," and "fully uncooperative." Following these refusals to cooperate, the officers detained the defendant in what Windmon described as a "*Terry* stop." After making physical contact, the defendant continued to refuse to comply when asked to place his arms

3

behind his back. Following Windmon's warnings, he used a taser to "gain control of the defendant's arms."

¶ 8    The State entered Windmon's body camera footage of the incident into evidence. The video showed the defendant instantly informing the officers that he was waiting for the train. Mozo responded by asking the defendant for his name and identification. The defendant informed the officers that he would not give them his information. Immediately after, officers ordered the defendant to "sit up, take the blanket off" several times so they could see the defendant's hands. The defendant informed the officers that he was waiting for the train and knew when the train arrived. Windmon stated that was "irrelevant." Again, Windmon requested the defendant to remove his blanket so he could "see [his] hands" and make sure he did not have any weapons. The defendant indicated that he did not have any weapons and that he was not going to remove his blanket because he was "not bothering nobody" and was "minding [his] business." At this point, the officers put their gloves on. The defendant indicated that his train was arriving at 4 a.m. Mozo told the defendant that he "can't be here." Windmon informed the defendant that they had "zero intentions of arresting" him, and again ordered the defendant to "sit up" and "take the blanket off." The defendant asked why the officers were bothering him, and Mozo responded that the defendant refused to give them his identification. The defendant stated, "I don't have to." The officers responded that the defendant had to give them his identification. When Windmon again asked for his name, the defendant responded, "don't worry about all that." As the officers approached the defendant, he removed both hands from under the blanket, one of which clearly held a cell phone. Approximately three seconds later, Windmon made physical contact with the defendant by grabbing the phone from his hands. In an apparent explanation for the contact, Windmon stated that they asked the defendant "to do something" and he "didn't want to do it." During the

4

commotion, the defendant again informed the officers that he was waiting on the train and that he had a ticket. A train horn can be heard in the background. After being put on the ground, the defendant stated, "get the fuck away from me." The officers began to place the handcuffs on the defendant. The officers threatened to tase the defendant if he did not place both hands behind his back. Approximately 12 seconds later, Windmon tased the defendant and secured handcuffs. After, the defendant asked the officers, "this how you treat people who waiting on the train," Mozo responded, "we asked you to give us something."

¶ 9    On cross-examination, Windmon stated that he saw the defendant's hands holding a cell phone and not a weapon before he made physical contact with the defendant. Windmon indicated that they had not received complaints of the defendant trespassing. No signs were posted on the platform preventing individuals from being there. Windmon did not ask the defendant to leave. There are no gates or fences to prevent people from entering the platform when it is closed. Windmon testified that "[a]s a representative of Metra," he was "authorized to dictate when somebody is trespassing." Windmon stated that it was a Metra policy that forbids individuals from being at the station "[i]f the trains aren't running." Windmon first observed the defendant at the station at approximately 2 a.m., made contact around 3 a.m., and the first train would have been arriving at 4 a.m. When asked whether it was "against the policy to be on the platform an hour early" for a train, Windmon responded that the defendant was more than an hour early. Windmon explained that he did not ask the defendant for his ticket because he "[n]ever got that far in the conversation," since the defendant "refused to comply with our first orders."

¶ 10    On re-direct examination, Windmon stated that part of an investigation into trespassing consisted of obtaining an individual's identification and "securing" officer safety. Windmon explained that he knew the Joliet Police Department told homeless individuals to go to the Metra

5

platform to "stay warm." If these individuals "were under the impression that they could be there," Metra police would not arrest them for trespassing. Windmon testified that the defendant informed the officers that he did not have any weapons, and the officers did not locate any weapons among the defendant's personal items. Windmon did not know if the defendant had been told by the Joliet police to go to the platform, and he did not inform the defendant that he could not be there.

¶ 11 The defendant testified that on the date in question, he walked for approximately one hour from the hospital to the Joliet station and was unsure exactly when he arrived. The defendant had a ticket in his wallet for the train that he expected to arrive at approximately 4:30 a.m. to take him to his job in Chicago. The defendant had his blanket, phone, phone charger, wallet, and identification card. The defendant was watching videos on his phone while he waited for the train when Mozo and Windmon confronted him. The officers first asked for the defendant's identification, and the defendant said he was not going to give it to them. The defendant was "pissed" and felt like the officers were harassing him. The officers then began asking the defendant to show his hands when "one thing led to another, and they grabbed [the defendant]" even though his hands were "already visible." They "thr[ew]" the defendant on the ground. The defendant stated that one arm was already behind his back at this point, but the other arm was "stuck" under his stomach. The defendant was not able to put that arm "all the way" behind his back due to nerve damage from a prior injury. The defendant did not have any weapons on him. The defendant did not see any signs that prohibited him from being at the station. He thought the station was open because the lights were on in the "main" building, and this meant someone was working the ticket counter.

¶ 12 On cross-examination, the defendant thought that the officers confronted him at approximately 3:30 a.m. The defendant left the hospital shortly after 2 a.m. and arrived at the

6

station around 3 a.m. When the officers approached, the defendant had his arms under the blanket to keep them warm. The defendant agreed that the officers first asked for his name and identification, and the defendant refused to give them that information. At this point, the defendant was still covered from the shoulders down. After several requests, the defendant removed his hands from the blanket. When the officer saw the defendant's phone, "that's when he grabbed" him. The defendant did not remember if he had his hands out of the blanket before or after the officers approached him. On re-direct examination, the defendant indicated that he did not want to make fast movements once the officers approached him. The defendant removed his hands from the blanket with his phone to record the officers because he "felt like the situation might get out of hand."

¶ 13    The jury found the defendant guilty of resisting a peace officer. The court sentenced the defendant to 24 months' conditional discharge. The defendant appealed.

¶ 14                                II. ANALYSIS

¶ 15    On appeal, the defendant argues that the State failed to present sufficient evidence to sustain his conviction of resisting a peace officer. The defendant reasons, *inter alia*, that the officers were not engaged in an authorized act to justify a *Terry* stop. In a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318 (1979)). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant." *Id.* Thus, "the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "A conviction will

be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 16    Here, the defendant was charged with resisting a peace officer, which required the State to prove that the defendant knowingly resisted the performance of an individual he knew was a police officer "of any authorized act within his *** official capacity." 720 ILCS 5/31-1(a) (West 2020). The act must be one that the officer was authorized to perform. *People v. Hilgenberg*, 223 Ill. App. 3d 286, 289 (1991). A *Terry* stop may be an authorized act that, if resisted, can be the basis of a conviction for resisting a peace officer. *People v. Johnson*, 285 Ill. App. 3d 307, 309 (1996). However, to be considered an authorized act, the officer must have observed unusual conduct leading to a reasonable, articulable suspicion that the person in question has committed or is about to commit a crime. 725 ILCS 5/107-14 (West 2020); see *Terry v. Ohio*, 392 U.S. 1, 21 (1968); see also *People v. Kipfer*, 356 Ill. App. 3d 132, 137 (2005). Thus, if the officers were not engaged in an authorized act or, otherwise stated, did not have a reasonable belief required under *Terry* to justify an investigative stop when the defendant resisted, the defendant's conviction must be reversed. *People v. Slaymaker*, 2015 IL App (2d) 130528, ¶ 12.

¶ 17    Relevant factors to consider when determining whether an officer had reasonable suspicion to conduct a *Terry* stop an individual include whether: (1) the stop occurred in a high crime area; (2) it was late at night or early in the morning; (3) the person engaged in "unprovoked flight" (*Illinois v. Wardlow*, 528 U.S. 119, 125 (2000)); and (4) the person's behavior was consistent with the officer's knowledge of criminal activity. *People v. Lozano*, 2023 IL 128609, ¶ 38. "Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly." *People v. Thomas*, 198 Ill. 2d 103, 110 (2001). We must view the facts from the perspective of a reasonable officer in that situation, rather

than analytical hindsight. *Id.* The facts supporting the officer's suspicion need not reach the level of probable cause, but they must amount to more than a mere hunch. *Id.*

¶ 18    At the outset, we note that the officers conducted a *Terry* stop due to the belief that the defendant could be trespassing. A person is guilty of trespassing when he or she, after receiving notice, "knowingly and without lawful authority enters or remains within or on a building." 720 ILCS 5/21-3(a)(1), (2) (West 2020); see also *id.* § 21-5 (a person commits criminal trespass to State supported land when, after receiving notice "from the State or its representative that the entry is forbidden"). At the time of the stop, the facts available to the officers were that members of the Joliet Police Department were known to inform homeless individuals that they could use the Metra platforms to get warm during inclement weather, and there were no signs posted on or around the platform to inform anyone when they were or were not permitted to be on the platform. The platform was open, and no gates or doors prevented entry, nor had the officers received any complaints of an individual trespassing. While the officers saw someone on the platform at 2 a.m., they could not identify the defendant as that individual. The officers approached the defendant on the platform at approximately 3 a.m., and the trains began running at 4 a.m. However, an individual waiting for a train an hour early is not "so far from the ordinary that any competent officer would be expected to act quickly." *Thomas*, 198 Ill. 2d at 110. Further, at no point did the officers order the defendant to leave. The defendant had no notice to vacate the premises, nor was he given an opportunity to leave. We find that the defendant's mere presence on the platform, without any other evidence, was insufficient to justify a *Terry* stop. See *People v. Lozano*, 2023 IL 128609, ¶ 37 ("The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." (Internal quotation marks omitted.) (quoting *Wardlow*, 528 U.S. at 123-24)). Given the information available to the officers, we cannot say that these facts lead to a

9

reasonable, articulable suspicion that the defendant had committed or was about to commit a crime. See *Kipfer*, 356 Ill. App. 3d at 137. As a result, the State failed to establish that the officers' *Terry* stop that precipitated his resisting a peace officer offense was justified by articulable reasonable suspicion and amounted to an "authorized act."

¶ 19     Even if we assume that the defendant's mere presence on the platform before the train began running factored into his "unusual conduct" to justify the officers initial stop, in light of the applicability of only one *Lozano* factor—that it was early in the morning—no other facts otherwise indicate criminal activity to justify the *Terry* stop of the defendant. See *Lozano*, 2023 IL 128609, ¶ 38. Notably, there is no evidence that the stop was in a high crime area, that the defendant attempted to flee, or that the defendant's behavior was consistent with the officer's knowledge of criminal activity. *Id.* Moreover, whatever reasonable suspicion existed dissipated when the defendant informed officers that he had a ticket for the train. See *People v. Pulido*, 2017 IL App (3d) 150215, ¶ 52 ("[A]n investigative stop must cease once reasonable suspicion or probable cause dissipates."); see also *People v. Jones*, 2015 IL App (2d) 130387, ¶ 16 (following a report of violence, an officer is "authorized to conduct some initial investigation," however, upon finding no evidence of a crime, his authority to continue ended). The officers had ample opportunity to request to view the defendant's train ticket but failed to do so. The officers cannot ignore or disregard new information from the defendant relevant to their trespassing investigation and insist that the defendant refused to provide information related to their investigation. As such, the officers lacked reasonable suspicion to justify their *Terry* stop, making it an unauthorized act and insufficient to support a conviction for resisting a peace officer.

¶ 20     Moreover, the officers failed to articulate any other criminal activity that they believed the defendant to have committed or was about to commit. Instead, the evidence showed that the

officers immediately asked the defendant to tender his identification upon contact. See *People v. Fernandez*, 2011 IL App (2d) 100473, ¶ 13 (the court held that an individual subject to a *Terry* stop has no obligation to answer the questions of a police officer, and the refusal to identify himself or provide identification to police officers was insufficient evidence to support a conviction for resisting or obstructing a peace officer). This fact, coupled with the officers informing the defendant that they had no intention of arresting him, followed almost immediately by the defendant's detention, indicates that the officers incorrectly believed they were justified in conducting a *Terry* stop of the defendant based solely on the refusal to tender his identification and his generally combative demeanor. See *id.* The facts presented are insufficient to justify a *Terry* stop and, thus, the officers' actions were unauthorized. See *Lozano*, 2023 IL 128609, ¶ 37.

¶ 21 Finally, the defendant's refusal to initially reveal his hands was insufficient to establish a reasonable suspicion that the defendant was armed and dangerous. First, the officers' belief that the defendant "could have had a weapon," without more, amounted to a mere "hunch," which is insufficient to establish reasonable suspicion. See *Terry*, 392 U.S. at 22 (intrusions upon constitutionally guaranteed rights must be based on more than inarticulate hunches). Second, before the officers made physical contact, the defendant showed his hands and phone to the officer. See *People v. Cope*, 299 Ill. App. 3d 184, 189 (1998) ("Refraining from physical action or failing to cooperate with the police is generally not considered the same as resisting or obstructing an officer."). The evidence showed that Windmon observed the defendant's hands prior to making contact, as his first action was to remove the defendant's phone from his hands. Not only did the officers lack reasonable articulable suspicion to justify their initial *Terry* stop, but the officers also lacked articulable suspicion once the defendant showed his hands. Windmon could clearly see, prior to making contact, that the defendant had his hands displayed and held a cell phone.

11

Therefore, the officers were not authorized or justified in conducting a *Terry* stop in this case, even taking the evidence in the light most favorable to the State, and therefore for the foregoing reasons, the evidence does not support the guilty verdict.

¶ 22                                         III. CONCLUSION

¶ 23            The judgment of the circuit court of Will County is reversed.

¶ 24            Reversed.