No. 2--05--0399                              filed: 3/23/06

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 04--CF--1079 |
| | ) | |
| DAMIEN O. BEVERLY, | ) | Honorable |
| | ) | Philip L. DiMarzio, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE CALLUM delivered the opinion of the court:

On June 7, 2004, defendant, Damien O. Beverly, was charged with aggravated unlawful use of a weapon (720 ILCS 5/24--1.6(a)(1) (West 2004)).  On March 17, 2005, the trial court granted defendant's motion to quash the arrest and suppress evidence.  The court subsequently denied the State's motions to reconsider and reopen proofs, and this appeal followed.  We affirm.

I. BACKGROUND

On March 10, 2005, the trial court held a hearing on defendant's motion to quash the arrest and suppress evidence.  Defendant testified as follows.  On June 7, 2004, at approximately 5 p.m., defendant drove to the Sagecrest apartment complex in Aurora to pick up his brother, Damore Beverly, who was staying with their aunt.  Defendant parked his car in a spot facing his aunt's building and her balcony.  He parked there because "it was directly in front of my aunt's building and I was physically sitting in the car.  So I thought it was proper for me to sit there and wait for my brother."  He always parked in the same area when visiting the apartment complex.  The parking

spot was not marked for guest parking, nor was it marked for residents only; he did not see any signs that distinguished resident parking from guest parking. Defendant testified that Sagecrest residents who own cars were supposed to have parking stickers. Defendant knew there was a sign at the parking lot's entrance that warned that illegally parked and unauthorized vehicles would be towed. He testified that there were no signs on the front of his aunt's building and that he did not see any "no trespassing" signs posted. There were no cars parked on the right or left sides of defendant's car.

Defendant telephoned Damore's cellular telephone, and his aunt informed him that Damore was coming downstairs. Defendant waited in his car for approximately two minutes before Damore arrived. Damore was in defendant's car for approximately 30 seconds when a squad car pulled up behind them. According to defendant, his car was in reverse and he was preparing to back out when the squad car pulled up with its lights activated and parked behind him, blocking his car. If defendant had driven forward, he would have driven into the apartment building; if he had driven backwards, he would have run into the squad car. Defendant testified that it was impossible for him to leave. Two police officers exited the squad car and approached defendant's vehicle. One officer approached on the driver's side and the other on the passenger's side. According to defendant, one of the officers, Michael Corrigan, asked for defendant's license and registration before asking him to step out of the vehicle. Corrigan subsequently took a gun from defendant's pants pocket.

Corrigan testified that he worked as a community policing officer for the Aurora police department. The community policing division develops relationships with property owners and residents to address crime issues. Corrigan testified that Sagecrest had a high level of drug and gang activity and that he had made around 15 to 20 narcotics arrests in the area. Typically, drug transactions at Sagecrest occurred in one of two ways. Drug dealers would park in front of the apartment buildings and customers would purchase drugs directly from the cars, or customers would

come up to the buildings and dealers would bring drugs down from the apartments. Accordingly, the Aurora police department had entered into a written trespass agreement with Sagecrest. According to Corrigan, the agreement entitled him to act as Sagecrest's agent to monitor the property and to determine whether people on the property were entitled to be there. Corrigan testified that Sagecrest management wanted him to come to the property and confront people who were there illegally or who were conducting questionable activities. In that capacity, he entered the property at least once daily. If he saw people he did not recognize, he would approach and ask if they were guests of residents. There are approximately 80 apartments in the complex; residents changed from month to month.

According to Corrigan, on June 7, 2004, at approximately 5 p.m. and in broad daylight, he and Officer Michael Dorr patrolled Sagecrest in a marked squad car. Both officers were in uniform. They observed defendant's car on the north side of one building in the complex. A "no loitering" sign was posted above the main entrance of the building. Defendant's car was parked three or four parking spots west of the main entrance. In addition, on the west side of the same building, there were a "no trespassing" sign, approximately 12 inches by 8 inches in size, and a "no loitering" sign. The "no trespassing" sign was approximately 20 feet from the entrance to the lot. The officers noticed that two men were sitting in the vehicle and that the vehicle did not have a Sagecrest parking sticker displayed on the bottom left corner of the back window. Sagecrest issued parking stickers to residents so that their vehicles would not get towed and to monitor visitor parking in the area; a Sagecrest sticker was required to park anywhere other than in a guest spot. There were no signs specifically addressing the Sagecrest parking sticker requirement. Corrigan did not recognize either of the vehicle's occupants, and the vehicle was not parked in a guest parking spot. Guest parking spots were located at the east side of the parking lot in front of the building.

Corrigan saw defendant's car for about 10 to15 seconds and decided to pull the squad car up behind it. He did not activate the squad car's oscillating lights. At the time he pulled up to the vehicle, Corrigan did not know whether defendant or his brother was a guest of a tenant or was banned from the property, nor had he received any reports of drug dealing or complaints about defendant's vehicle. Corrigan did not consider 10 to15 seconds to establish loitering. Corrigan testified that he stopped the squad car directly behind and perpendicular to defendant's vehicle, such that defendant would have hit the squad car if he had tried to back up. Corrigan exited the vehicle and approached the driver's door, while Dorr approached the front passenger's door. On direct examination, Corrigan testified that he did not display his weapon, make any commands, or say anything as he approached defendant. On cross-examination, Corrigan testified that he may have asked for defendant's identification when he first approached. Corrigan testified that he did not believe defendant's vehicle was running and that he did not see defendant make any attempt to pull out of the space or get out of the vehicle.

Corrigan next observed Damore moving his hands in the vehicle and heard Dorr ordering him to put his hands up in the air. Corrigan saw a plastic baggy next to Damore. Defendant turned his torso as if to reach for the baggy; Corrigan opened the driver's door, grabbed defendant's arm, and asked him to step out of the vehicle. He walked defendant to the rear of the vehicle and asked him if he or Damore was visiting someone. Defendant stated that he was just waiting for someone. Because Dorr appeared to be having trouble controlling Damore, Corrigan placed defendant in handcuffs. Defendant stated that he had a gun in his pocket, and Corrigan removed a loaded 9-millimeter gun from defendant's left front pants pocket. In his report, Corrigan wrote that he was interested in defendant's vehicle because of the trespass agreement. The report did not mention the

area's narcotics or gang activity as a basis for the encounter. Corrigan testified that he stopped behind defendant's vehicle pursuant to the trespass agreement.

Dorr's testimony substantially mirrored Corrigan's testimony. Dorr added that, if the officers saw someone they did not recognize on Sagecrest's property, they would stop the individual, ask for identification and the individual's purpose for being on the property, and then check with their dispatcher to see if the individual was banned from the property. These actions were taken regardless of whether the officers had witnessed a crime or had contemporaneous reports of crime. Dorr testified that he was authorized by Sagecrest management to stop people on the property and request identification. Dorr did not see defendant commit any offenses before Corrigan pulled the squad car behind defendant's vehicle. He testified that the lack of a parking sticker was not an offense and that he did not know whether defendant or his brother had received any prior warnings not to be on the property. In addition, Dorr testified that the squad car was perpendicular to defendant's car, but that he could not recall if there was room for defendant to back the car out and leave. He acknowledged that someone pulling into a parking spot on the west side of the building might not see the signs on the east side of the building designating guest parking. Dorr estimated that it took approximately 10 seconds to pull the squad car behind defendant's vehicle after entering the parking lot.

The trial court granted defendant's motion to quash the arrest and suppress evidence. The court found that the police officers stopped their car behind and perpendicular to defendant's car, which was in a parking space facing the building. In so finding, the court concluded that "[a] police car parked in the street behind and perpendicular to the defendant's car which was parked in front of a building, especially since the evidence, the uncontradicted evidence suggests that the defendant had his vehicle in reverse, is a seizure." The court held that the driver of a vehicle in this situation

would not reasonably feel free to leave and, in fact, would be unable to leave unless he was willing to abandon his vehicle and walk away. The court summarized that: (1) defendant testified that his car was running and was in reverse; (2) Corrigan testified that he did not believe the car was running and that defendant made no gesture to pull out; and (3) Dorr was not asked if the car was running. Neither officer was asked if defendant's back-up lights were on. Moreover, the court concluded that there was insufficient evidence to justify the seizure--"there were two men in a legally parked car running in reverse at five p.m. in the afternoon. There was no furtive conduct observed on the part of either man prior to the officers stopping immediately behind their car." The court found that the officers had not activated the squad car's lights. Because an unjustified seizure occurred prior to the discovery of defendant's weapon, the trial court granted the motion to quash the arrest and suppress evidence.

In light of the trial court's ruling, the State moved to reopen the evidence to submit additional clarifying evidence from the officers regarding whether defendant's vehicle was in reverse. The trial court denied the motion, stating, "I don't think it would be a judicious exercise of my discretion to permit it. We had the hearing, he was on the stand, both sides had direct and redirect on witnesses and cross and recross. And I heard certain testimony on this point, and I heard one witness say that he wasn't sure and the other witness wasn't asked about it, so I made my finding accordingly."

In its motion to reconsider, the State argued that the trial court erred in finding that defendant's car was in reverse. The trial court reiterated that it had found the officers to be credible witnesses, but that it made a negative inference that defendant's car was in fact in reverse because one officer testified credibly that he was uncertain and the other officer was not asked about it. The court presumed that the question was not asked of Dorr as a matter of strategy, and it refused to assume an oversight on the State's behalf. Moreover, given that the State impeached defendant on

nearly every point, but did not impeach him on whether his vehicle was running and in reverse, the court found that defendant's testimony on that point garnered more credibility. The motion to reconsider was denied and the State appealed.

## II. ANALYSIS

### A. Reopening of Proofs

The State argues that the trial court erred in denying its motion to reopen its proofs. We review for an abuse of discretion a trial court's denial of a motion to reopen the evidence. See, e.g., People v. Berrier, 362 Ill. App. 3d 1153 (2006); People v. Schumann, 120 Ill. App. 3d 518, 527 (1983). A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or when no reasonable person could take the court's view. People v. Illgen, 145 Ill. 2d 353, 364 (1991).

The State contends that whether defendant's car was in reverse was pivotal to the trial court's decision to grant defendant's motion to quash and suppress. Accordingly, the State argues that the trial court abused its discretion by refusing to allow the State to reopen its proofs to supplement and clarify the officers' testimony regarding whether defendant's car was in reverse when the squad car pulled behind his vehicle.

First, we note that, while the trial court certainly found significant defendant's testimony that his car was in reverse, we do not agree with the State's contention that the testimony was "pivotal," or that it was the "linchpin in and the crux of the trial court's decision" to grant the motion. The trial court held that the seizure occurred when the squad car parked perpendicularly to and behind defendant's vehicle so that defendant could not exit the parking space or leave without abandoning his vehicle. Although the court went one step further to say that these actions constituted a seizure "especially" since the evidence suggested that defendant's car was in reverse, we believe that the

court's finding that the car was in reverse merely provided additional support for its conclusion that the blocked car's occupants were seized. In other words, we read the trial court's ruling such that it would have found a seizure even if the car was not in reverse. Accordingly, the trial court's refusal to reopen proofs for additional testimony on this point was not an abuse of discretion.

The State further asserts that, because Dorr testified that defendant's car was not blocked, additional testimony addressing the distance between defendant's vehicle and the squad car is needed. The State mischaracterizes the testimony. In his testimony, Dorr agreed that the squad car was parked perpendicularly to defendant's vehicle. When asked whether defendant's car had room to back out and leave, Dorr could not recall.

In any event, the trial court held a full hearing on defendant's motion to quash and suppress, considered the officers' testimony (or lack thereof), and ruled on the motion. Only after the court issued its ruling, when it became clear that the court credited defendant's testimony that his car was in reverse, did the State move to present additional, clarifying evidence addressing what the officers saw. The State was not entitled to a postruling opportunity to cure court-identified flaws in its case. Under these circumstances, the trial court was well within its discretion to deny the State's motion.

B. Motion to Quash Arrest and Suppress Evidence

1. Standard of Review and Burden of Proof

The State next challenges the trial court's substantive ruling on the motion to quash and suppress, arguing that the trial court erroneously concluded that an improper investigatory stop occurred. The standard of review applicable to a ruling on a motion to quash an arrest and suppress evidence is twofold. The trial court's factual findings and credibility determinations are upheld

unless they are against the manifest weight of the evidence. People v. Jones, 215 Ill. 2d 261, 267-68 (2005); People v. Smith, 214 Ill. 2d 338, 347 (2005). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. People v. Luedemann, 357 Ill. App. 3d 411, 417 (2005), appeal allowed, 216 Ill. 2d 713 (2005). After the trial court's factual findings are reviewed, the court's ultimate legal rulings are reviewed de novo. Jones, 215 Ill. 2d at 268; Smith, 214 Ill. 2d at 347.

The fourth amendment to the United States Constitution protects individuals' rights to be free from unreasonable searches and seizures. Jones, 215 Ill. 2d at 268. Generally, for a search or seizure to be reasonable, the fourth amendment requires a warrant supported by probable cause. Jones, 215 Ill. 2d at 269. Nevertheless, a warrantless investigatory vehicle stop may be reasonable if the law enforcement officer can point to specific, articulable facts that, when combined with rational inferences derived therefrom, create reasonable suspicion that the person seized has committed or is about to commit a crime. Terry v. Ohio, 392 U.S. 1, 21-22, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880 (1968); Jones, 215 Ill. 2d at 270; see also 725 ILCS 5/107--14 (West 2004). The facts supporting reasonable suspicion need not constitute probable cause and can arise when no violation of the law is witnessed; however, a mere hunch is insufficient to justify a Terry stop. People v. Thomas, 198 Ill. 2d 103, 110 (2001); Luedemann, 357 Ill. App. 3d at 420. We objectively consider whether a stop was proper, looking at the facts available to the officer at the time of the seizure to determine whether his or her actions were appropriate. Luedemann, 357 Ill. App. 3d at 420. The situation encountered by the officer must be so far from the ordinary that any competent officer would be expected to act quickly. Thomas, 198 Ill. 2d at 110; People v. Croft, 346 Ill. App. 3d 669, 675 (2004).

The State first argues that defendant's motion should have been denied because he failed to satisfy his burden of showing that he was not doing anything unusual prior to his contact with the police and, thus, the burden of proof never shifted to the State. A defendant who files a motion to quash and suppress must make a prima facie case that he was doing nothing unusual to justify the intrusion of a warrantless search or seizure. People v. Garvin, 349 Ill. App. 3d 845, 851 (2004); People v. Welling, 324 Ill. App. 3d 594, 600 (2001). If the defendant satisfies this burden, then the State must present evidence to justify the intrusion. Garvin, 349 Ill. App. 3d at 851; Welling, 324 Ill. App. 3d at 600. The ultimate burden of proof remains with the defendant. People v. Kveton, 362 Ill. App. 3d 822, 832 (2005).

Here, the facts are undisputed that, when the officers arrived, defendant was parked in a parking spot in front of his aunt's apartment building, facing her balcony. According to the officers' testimony, they saw defendant sitting in his car, in broad daylight, for only 10 to 15 seconds before they parked behind him. Despite the fact that the complex posted "no loitering" and "guest parking" signs, Corrigan did not consider 10 to15 seconds to constitute loitering, and Dorr conceded that someone parked on the west side of the building might not see the "guest parking" signs posted on the east side of the building. There were no cars parked on either side of defendant's vehicle, no residents were currently being hindered from parking their vehicles, and the officers had not received any complaints about defendant's vehicle. Accordingly, we conclude that defendant made a prima facie showing that he was doing nothing unusual when the officers approached him. At some point, a search and seizure undisputably occurred without a warrant. Thus, the burden shifted to the State to provide evidence establishing the validity of the search and seizure.

2. Seizure

To assess the validity of the search and seizure, we must first determine when defendant was seized. Under the fourth amendment, a person is seized when an officer, " 'by means of physical force or show of authority,' " restrains a citizen's liberty. *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 398, 111 S. Ct. 2382, 2386 1991 , quoting *Terry*, 392 U.S. at 19 n.16, 20 L. Ed. 2d at 905 n.16, 88 S. Ct. at 1879 n.16. We look to the totality of the circumstances to determine whether a reasonable person would feel free to leave under the circumstances. Kveton, 362 Ill. App. 3d at 834. The analysis hinges on an objective evaluation of the police conduct and not upon the subjective perception of the person approached. Kveton, 362 Ill. App. 3d at 834. Moreover, "[p]recedent may provide some insight; however, common sense must be our main guide in assessing the totality of the circumstances and determining whether a reasonable person in defendant's position would feel free to leave." Luedemann, 357 Ill. App. 3d at 421.

Viewing the totality of the circumstances, we conclude that defendant was seized when the squad car parked perpendicularly to and behind his vehicle. A seizure may occur when a police officer blocks a defendant's egress or restricts a defendant's movement. In People v. Gherna, 203 Ill. 2d 165 (2003), two uniformed officers, riding bicycles marked "police," approached the defendant in her parked car. One officer positioned himself and his bicycle at the driver's door while the other officer positioned himself at the passenger's door. The supreme court ultimately held that the officers' positioning of themselves and their bicycles, which prevented the defendant from exiting the vehicle or driving away, coupled with the officers' questioning, would have prevented a reasonable person from feeling free to terminate the encounter and, thus, constituted a seizure. Gherna, 203 Ill. 2d at 180.

Similarly, in Luedemann, the defendant was legally parked in front of his girlfriend's house at approximately 2:40 a.m. A uniformed officer drove by in his marked squad car and saw the defendant reach toward the floor of the passenger side and slump in his seat as the squad car got closer to the defendant's vehicle. The officer did not have any information about the defendant committing a crime or about any criminal activity in the area that night, although he did know that three homes and some cars had recently been burglarized in the area. The officer parked the squad car in the middle of the street, got out of the car, and approached the defendant while shining his flashlight on the vehicle. The defendant was ultimately arrested for driving under the influence of alcohol and unlawful possession of a controlled substance.

The trial court granted the defendant's motion to suppress, and this court affirmed. Luedemann, 357 Ill. App. 3d at 421. In pertinent part, we determined that the officer's stopping his car in the middle of the road communicated a sense of urgency and was consistent with the conduct of an officer demonstrating his authority to initiate formal contact with a suspect. Luedemann, 357 Ill. App. 3d at 421. In that situation, we determined that no ordinary citizen would feel free to simply start his or her car and drive away. Luedemann, 357 Ill. App. 3d at 421. We note that, in his dissent, Presiding Justice O'Malley suggested that an even greater sense of urgency would have been communicated had the officer blocked the defendant's car in its parking space. Luedemann, 357 Ill. App. 3d at 431 (O'Malley, P.J., dissenting). In any event, we determined that the seizure was unjustified. The officer's knowledge that the defendant was in a neighborhood where homes and cars had recently been burglarized did not create a reasonable belief that the defendant was involved in a crime. Luedemann, 357 Ill. App. 3d at 424. And, even viewing collectively all facts available

to the officer, we could not conclude that the situation he faced was so far from the ordinary that any competent officer in a similar position would act with haste.[1] Luedemann, 357 Ill. App. 3d at 425.

The State asserts that there had been no show of authority sufficient to effect a seizure, because the officers did not draw their weapons, turn on their lights, issue commands to defendant, or impede him from exiting his vehicle. We do not find this argument persuasive. First, on cross-examination, Corrigan testified that he might have asked for defendant's identification as he approached the vehicle. In any event, Gherna and Luedemann indicate that the officers' positioning of the squad car to block defendant's exit constituted an exercise of authority sufficient to effectuate a seizure. We note that the officers were in a marked squad car, were dressed in full uniform, and

---

[1] In the Official Reports Advance Sheet and the unofficial reporters (People v. Luedemann, 828 N.E.2d 355, 368, 293 Ill. Dec. 385, 398 (2005)), this phrase appears as, "without haste." (Emphasis added.) This is clearly a typographical error (see Croft, 346 Ill. App. 3d at 675), and the phrase will appear correctly in the bound volume of the Official Reports.

subsequently approached on each side of defendant's vehicle. Common sense dictates that a reasonable person in such circumstances would not feel free to terminate the encounter.

The State contends that it is "highly questionable," based on the evidence, that the squad car blocked defendant's vehicle so that it could not back up. The State essentially supports its argument by challenging defendant's credibility and pointing to areas where his testimony was impeached. Regardless, the trial court's finding of fact, that the vehicle was blocked so that it could not back up, will be upheld unless it is against the manifest weight of the evidence. Jones, 215 Ill. 2d at 267-68. Corrigan testified that defendant's car would have hit the squad car if he had backed up. When asked whether defendant had room to back out his vehicle and leave, Dorr testified that he could not recall. Accordingly, the trial court's finding that defendant's vehicle was blocked was not against the manifest weight of the evidence.

Finally, the State, relying on People v. Thomas, 315 Ill. App. 3d 849, 857 (2000), argues that, even if defendant did not feel free to leave, there was no seizure unless he submitted to the seizure and was actually restrained. The State's reliance on Thomas is misplaced. There, the police tried to stop the defendant but the defendant fled on his bicycle, resulting in a chase. Here, defendant was actually restrained by the squad car's position. Defendant did not flee, nor could he without abandoning his vehicle.

### 3. Reasonable Suspicion

Having determined when defendant was seized, we next consider whether the facts available to the officers at the time justified the seizure. The State contends that, based on the nature of the neighborhood, the officers were authorized by Sagecrest management to keep unauthorized persons off the premises. Accordingly, the State argues that the officers possessed reasonable suspicion to investigate defendant's vehicle for possible criminal trespass to property, because they saw two

individuals, whom they did not recognize, in a vehicle that did not have a Sagecrest parking sticker, parked in a resident parking space. In essence, the State contends that the seizure was justified by the circumstances and by the trespass agreement with Sagecrest management. We disagree.

The relevant facts are undisputed. First, regarding the circumstances of the stop, we note that, at the time of the seizure, the officers saw two men sitting in a parked car for 10 to15 seconds, at 5 p.m. and in broad daylight, in front of an apartment building. The officers had not received any complaints about the vehicle or its occupants. A "no loitering" sign was posted somewhat near defendant's car, but Corrigan did not consider sitting in a car for 10 to 15 seconds to be loitering. The officers did not recognize the vehicle's occupants, and they did not know whether defendant was a resident or a guest and, accordingly, whether defendant was improperly parked in a resident spot. Indeed, given that there are 80 apartments in the Sagecrest complex and that residents frequently change, we would not be surprised if it is difficult to be familiar with every Sagecrest resident. The officers knew that Sagecrest had a high level of criminal activity. Even viewed collectively, these circumstances did not give the officers anything more than a mere hunch that crime was afoot. Thomas, 198 Ill. 2d at 110.

In People v. Kipfer, 356 Ill. App. 3d 132, 138 (2005), this court held that a police officer lacked reasonable suspicion for a Terry stop when, at 3:40 a.m., he saw the defendant come out from behind a Dumpster and walk through the parking lot of an apartment complex. The officer did not see the defendant do anything illegal, and the fact that car burglaries had recently occurred in the parking lot did not give the officer reasonable suspicion that the defendant had committed or was about to commit a crime. Kipfer, 356 Ill. App. 3d at 138. The defendant's presence in the parking lot at a late hour was not suspicious, and the officer failed to articulate any facts to distinguish the defendant from a resident of the apartment complex, a guest of a resident, or a mere passerby.

Kipfer, 356 Ill. App. 3d at 138. " 'An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.' " Kipfer, 356 Ill. App. 3d at 138, quoting Illinois v. Wardlow, 528 U.S. 119, 124, 145 L. Ed. 2d 570, 576, 120 S. Ct. 673, 676 (2000); see also Luedemann, 357 Ill. App. 3d at 424.

Here, the officers did not see defendant do anything illegal. Defendant's presence in the parking lot of an apartment complex in broad daylight, even though the area was a high-crime area, did not provide reasonable suspicion that he was engaged in a crime. Indeed, the police report and the officers' testimony make clear that they did not block defendant's car because they had reasonable suspicion that he was engaged in criminal activity. And, although defendant's car lacked a Sagecrest parking sticker and was parked in a resident spot, the officers simply did not know whether defendant was a new resident or merely a visitor who parked in the wrong spot. Accordingly, the officers had only a hunch that defendant might be trespassing, and the situation was not so far from the ordinary that any competent officer would have been expected to act quickly. Thomas, 198 Ill. 2d at 110; Croft, 346 Ill. App. 3d at 675.

Moreover, the trespass agreement with Sagecrest management did not authorize a seizure. Although the evidence showed that defendant's vehicle lacked a Sagecrest parking sticker and that the officers determined that they should, pursuant to the agreement, approach defendant, the agreement did not give the officers authority to seize without reasonable suspicion. In People v. Thompson, 337 Ill. App. 3d 849 (2003), police officers stopped the defendants pursuant to an interagency agreement between the Danville police department and the Hispanic Housing Authority that authorized the police to stop and identify any unknown persons on housing authority property. The officers parked their car behind the defendants' truck to block it from leaving. The trial court

granted the defendants' motion to suppress, noting that the only expressed purpose for the stop was to determine whether the defendants were subject to the agency agreement. As such, the trial court held that the officers exceeded the scope of any community-caretaking encounter by parking the police car in a way that prevented the defendants from leaving. In affirming the trial court's decision, the court concluded that "[t]he interagency agreement gave the officers authority under certain circumstances to perform a community-caretaking encounter and nothing more. Therefore, the interagency agreement cannot be the basis for forming a reasonable articulable suspicion of criminal activity." Thompson, 337 Ill. App. 3d at 856.

The same is true here. The officers testified that they were interested in defendant's vehicle because of the trespass agreement. Nevertheless, although the officers had reason to want to approach and question defendant, the agency agreement did not justify intrusion upon fourth amendment rights. See, e.g., People v. Murray, 137 Ill. 2d 382, 391-92 (1990); People v. Mitchell, 355 Ill. App. 3d 1030, 1034 (2005); Thompson, 337 Ill. App. 3d at 856. Indeed, we suspect that the officers' goals could easily have been accomplished without the seizure, given that there was no one parked on either side of defendant's vehicle. Perhaps the officers could have parked the squad car nearby and approached instead of parking behind defendant's vehicle. In any event, we find that the seizure was not justified based on the trespass agreement between Sagecrest management and the police department.

Finally, the State argues that the actions taken by defendant and Damore after the car was blocked and as the officers approached were questionable and that the officers' reasonable suspicions of a possible offense were heightened. The State relies on People v. Rodriguez, 154 Ill. App. 3d 401 (1987), and People v. Rogers, 71 Ill. App. 3d 1046 (1979); both cases are inapposite. In Rodriguez, the defendant conceded that the initial stop, in response to a loitering complaint, was

lawful and challenged only the search of his vehicle. <u>Rodriguez</u>, 154 Ill. App. 3d at 403. Similarly, in <u>Rogers</u>, the court concluded that the initial stop was clearly lawful, but addressed whether the officers were justified in their additional detention of the defendant. <u>Rogers</u>, 71 Ill. App. 3d at 1049. In both cases, the officers lawfully stopped the defendants' vehicles, and the issue of furtive conduct pertained to the subsequent searches and detentions. Accordingly, these decisions do not help the State here, where the initial seizure was unlawful.

We cannot say that the facts available to Corrigan and Dorr at the time of the seizure provided a reasonable, articulable suspicion that defendant had committed or was about to commit a crime. We conclude that the seizure was unjustified under these circumstances, and we affirm the trial court's order granting the motion to quash the arrest and suppress evidence.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

BOWMAN and BYRNE, JJ., concur.