2020 IL App (1st) 150354

FIRST DISTRICT
FOURTH DIVISION
November 19, 2020

No. 1-15-0354

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 13 MC5 005735 |
| ROBERT GALLAGHER, | ) | |
| | ) | |
| | ) | |
| Defendant-Appellant. | ) | Honorable |
| | ) | Patrick T. Rogers, |
| | ) | Judge Presiding. |
| | ) | |

JUSTICE REYES delivered the judgment of the court, with opinion.
Justices Hall and Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Robert Gallagher was convicted of obstructing a peace officer's performance of authorized acts (720 ILCS 5/31-1(a) (West 2012)). He now appeals, arguing that (1) he was not proved guilty beyond a reasonable doubt, as the peace officer's seizure of him was not authorized and he did not hinder the peace officer's investigation and arrest for criminal trespass, (2) the trial court committed reversible error when it tendered improper jury instructions, (3) he was denied a fair trial where the prosecutor engaged in

misconduct by attempting to solicit improper testimony from him during cross-examination, (4) the trial court failed to conduct a preliminary inquiry as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), after he alleged ineffective assistance of trial counsel, and (5) the trial court erred where it did not properly instruct the jury of the principles set forth in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We reverse defendant's conviction, as we conclude that the officer's seizure of defendant was unauthorized where the officer lacked a reasonable articulable suspicion that defendant was engaged in criminal activity.

¶ 2                                I. BACKGROUND

¶ 3     Defendant was charged by misdemeanor complaint with criminal trespass to real property (720 ILCS 5/21-3(a)(2) (West 2012)) based on the allegations that on October 20, 2013, he knowingly entered upon the land of Nancy's Minuteman (gas station), located at 8050 Ogden Avenue in Lyons, despite several "no trespass" signs being posted on the property and not having permission from the owner. Defendant was also charged with "resisting/obstructing" a peace officer (*id.* § 31-1) where he knowingly "resisted/obstructed" the performance of Officer Nathan O'Connor while Officer O'Connor was conducting an authorized act within his official capacity (the investigation and arrest for criminal trespass). Defendant allegedly failed to comply with Officer O'Connor's commands and attempted to gain access to the trunk area of defendant's vehicle.

¶ 4     At trial, Rayhan Dursun testified that he is the owner of the gas station, in question, which is open from 5 a.m. until 11 p.m. every day of the week. Dursun testified that for 16 years a sign has been posted on the property that states, "unauthorized vehicles not allowed on this property, or if you are unauthorized, we'll tow you away." According to Dursun, that sign was posted on October 20, 2013, and he did not authorize defendant to be at the gas station at that

time. Dursun further testified that defendant was not authorized to use the air pump at 12:45 a.m.

¶ 5    On cross-examination, Dursun testified that the gas station also includes a convenience store and a mechanic's shop. Outside in the parking lot, there is a vacuum cleaner and a coin-operated air pump station. According to Dursun, people use the air pump when the gas station is closed. Dursun also testified that he did not have a "no trespassing" sign displayed at the gas station and that he had never met defendant before, nor did he ever inform the defendant he was not welcome there.

¶ 6    Officer O'Connor, who was working for the Lyons Police Department at the time of this incident, testified that on October 20, 2013, at 12:45 a.m., he was traveling westbound on Ogden Avenue in his marked police vehicle. He pulled into the parking lot of the gas station to do a routine after-hours business check. Once he entered the gas station, he observed a vehicle parked in the northwest corner of the parking lot. According to Officer O'Connor, the vehicle "appeared to be suspicious because it was not running" and it "looked like it was occupied" but no lights were on. He then positioned his police vehicle behind the suspicious vehicle and illuminated it with his spotlight. After he did so, he observed two occupants in the vehicle, one being defendant. Officer O'Connor exited his vehicle. As he approached defendant's vehicle, defendant turned the vehicle on and began executing a three-point turn. Officer O'Connor got defendant's attention by waving his hands and making voice commands. Once defendant stopped the vehicle, defendant yelled, "What do you want?" Officer O'Connor responded that he wanted to see defendant's license and proof of insurance.

¶ 7    According to Officer O'Connor, defendant became "very belligerent" and was "yelling and cursing" at him, saying he was going to take Officer O'Connor to federal court. Defendant, however, did present Officer O'Connor with an Indiana driver's license and an invalid insurance

card. When Officer O'Connor explained to defendant that his insurance card was not valid, defendant "calmed down a bit" and informed Officer O'Connor that his valid insurance card was in the trunk. Defendant then pressed the trunk release button from inside the vehicle and instructed the front seat passenger to exit the vehicle to locate the valid insurance card.

¶ 8 Officer O'Connor advised the front seat passenger that she could not exit the vehicle and go into the trunk. Officer O'Connor explained that it was an officer safety issue because "[y]ou don't know if somebody is in the trunk. You don't know if there's a weapon in the trunk." Officer O'Connor also explained that he was the only officer present at the time.

¶ 9 After Officer O'Connor instructed the passenger to stay in the vehicle, defendant became "very belligerent again, cursing, yelling. Stated again, you know, that he was going to take me and the Lyons Police Department to federal court. Said that—asked if he was under arrest. Stated that he was going to do what he wants and that he was going to exit the vehicle."[1]

He then attempted to exit the vehicle by opening the driver's side door. Officer O'Connor advised him he could not exit the vehicle and pushed the door closed. Defendant continued yelling and cursing.

¶ 10 Shortly thereafter, two additional officers arrived on the scene, and Officer O'Connor instructed defendant to exit the vehicle. According to Officer O'Connor, defendant immediately began walking towards the rear of his vehicle. Officer O'Connor testified he stopped defendant by grabbing his right arm and advised him he could not access the trunk. Defendant continued to state he would take him to federal court. Defendant attempted to walk away as Officer O'Connor was holding his arm. According to Officer O'Connor, "at that point, I advised him that he was

---

[1]On cross-examination, Officer O'Connor clarified that defendant was not under arrest at this time.

under arrest for obstructing and trespassing." Defendant was placed into custody and seated in the back of Officer O'Connor's police vehicle. Officer O'Connor further testified that the vehicle defendant was driving was not parked near the vacuum or air pump.

¶ 11    On cross-examination, Officer O'Connor testified that he did not observe the vehicle enter the gas station and he did not know how long the vehicle had been there. He also was unaware of where the vehicle first stopped when it entered the gas station. When asked why he found the vehicle suspicious, Officer O'Connor replied:

"The business was closed. It was after midnight. That particular business in question, there's been several problems in the past with burglary. They have been robbed. They have had quite a bit of problems. So the vehicle—it was not running. There were no lights on. It was parked in an area of the parking lot where there are no lights—[.]"

¶ 12    Officer O'Connor also clarified that when he came into contact with defendant, he was seated inside the vehicle and was not outside of the gas station doing anything suspicious. When defendant went to retrieve his driver's license and proof of insurance, Officer O'Connor explained he was not concerned about officer safety. Defense counsel also asked Officer O'Connor if he "really want[ed defendant] to produce" the insurance card. Officer O'Connor replied that he asked for the insurance card "out of habit because of traffic stops" but clarified that "[t]his wasn't a traffic stop." Officer O'Connor further testified, "After he handed it to me, I thought about how I didn't really need the insurance card, and I just wanted to let him know that it was expired." At that time defendant was not under arrest, but defendant was not free to leave because he was conducting an investigation "of a suspicious vehicle occupied by two subjects parked behind a closed business after midnight in a dark section of the parking lot, a business which has had numerous problems in the past."

¶ 13    Officer O'Connor further testified that he called in defendant's driver's license for processing through the Law Enforcement Agencies Data System (LEADS) and was advised that there were no outstanding warrants for defendant's arrest. Officer O'Connor also clarified that he did not call for backup but that two of his fellow officers happened to arrive at the scene at that time.

¶ 14    According to Officer O'Connor, it is not illegal to curse at a police officer or to threaten a lawsuit. That was, "Just part of my job. Happens all the time." Officer O'Connor kept an even temper during the encounter.

¶ 15    The State rested, and defendant moved for a directed verdict, which was denied. The defense presented the following testimony from Nada Pajevic, defendant's girlfriend. On October 20, 2013, at 1:30 a.m., she was driving her vehicle with defendant in the passenger seat when the vehicle experienced an issue with the tires. She pulled over at the gas station to check the tires. Defendant exited the vehicle and then indicated he wanted to drive it to determine the cause of the issue. Just after defendant got into the driver's seat a police vehicle pulled up behind them with bright and flashing lights on. Officer O'Connor exited his police vehicle and approached their vehicle. According to Pajevic, the first statement from Officer O'Connor to them was, "Did you know that you cut me off back there?" and then he requested defendant produce his driver's license and proof of insurance. Defendant produced his driver's license and an expired insurance card. Officer O'Connor asked whether defendant had proof of valid insurance. Defendant asked Pajevic if she had a valid insurance card, and she replied that it was in the trunk. Defendant then told Officer O'Connor that he needed to get the insurance card from the trunk and began to open the vehicle door. Officer O'Connor then slammed the door with both hands to close the door on him. Defendant asked if he was under arrest, and Officer O'Connor

said no. The officer then went on his police radio and "immediately" there was "a swarm of squad cars."

¶ 16 Officer O'Connor asked defendant to exit the vehicle, and defendant complied. While Officer O'Connor did not have his weapon drawn, one other officer had a weapon pointed at Pajevic. Officer O'Connor slammed defendant against the vehicle causing it to "sh[ake] like crazy." She then observed Officer O'Connor pulling defendant's right arm and twisting it behind his back to handcuff him. According to Pajevic, defendant did everything the officer requested of him and did not resist.

¶ 17 On cross-examination, Pajevic testified that while the gas station was closed, she pulled over because the vehicle she was driving was experiencing a mechanical problem and there was an air pump at the station. She parked the vehicle but did not turn off the engine. Defendant then exited the vehicle and examined the tires. Finding no immediately visible issue, defendant requested to drive the vehicle, so she moved over to the passenger seat.

¶ 18 When Officer O'Connor allowed defendant to exit the vehicle, defendant walked toward the trunk. At that point, Pajevic could not see what happened, as she was facing forward.

¶ 19 The defendant provided the following testimony. On October 20, 2013, at 1:30 a.m., he and Pajevic left a restaurant and were heading home. Pajevic was driving the vehicle, and he was in the front passenger seat. As Pajevic drove around a curve, he heard a "lump, lump, lump noise from the right, front tire or wheel assembly." He told her that it sounded like the tire was almost flat and suggested they go to a gas station. They pulled into the gas station looking for an air pump. Defendant exited the vehicle to inspect the tire. The tire appeared to have enough air so he requested Pajevic move to the passenger seat so he could drive. As he was backing out of the parking lot, a vehicle with a spotlight came "rushing in like they were looking for bank robbers."

Officer O'Connor came up to the driver's side window, and defendant asked what the officer wanted. Officer O'Connor asked for defendant's driver's license and proof of insurance. He handed Officer O'Connor the driver's license but did not hand him the insurance card because he noticed it was expired. Defendant asked Pajevic if she had a valid insurance card, and she stated that it was in the trunk. Prior to his exiting the vehicle, Officer O'Connor never informed him he was not allowed to retrieve the insurance card from the trunk. When he attempted to get the insurance card, he believed he was complying with Officer O'Connor's request to produce a valid insurance card. As he proceeded to exit the vehicle, Officer O'Connor slammed the door on his arm. Defendant admitted threatening the officer with a lawsuit. A few seconds later, four police vehicles appeared, and Officer O'Connor instructed defendant to exit the vehicle. When the defendant complied with Officer O'Connor's request and exited the vehicle, the officer slammed him against the automobile so hard that it shook.

¶ 20     On cross-examination defendant testified he was not aware that the gas station was closed but did observe that the lights inside the gas station were not on at the time and that no attendant was present. Defendant acknowledged that the officer did not instruct him to open the trunk. According to defendant, after Officer O'Connor slammed the door on him, Officer O'Connor told him to forget about the valid insurance card. Defendant denied swearing at Officer O'Connor but admitted to threatening to sue him. Defendant also testified that after the additional police vehicles arrived at the scene, Officer O'Connor instructed him to get out of the vehicle and to stand by the rear fender. Defendant denied he was going for the trunk because, at this time, Officer O'Connor had informed him to "forget about" the insurance card.

¶ 21     On redirect, defendant testified that no one ever forbid him from going into the gas station property and that he never observed a "no trespassing" sign.

¶ 22    The defense rested and the trial court conducted a jury instructions conference. The parties agreed to the instructions provided to the jury. After hearing closing arguments, the jury deliberated and ultimately found defendant not guilty of trespass to real property but guilty of resisting or obstructing a police officer.

¶ 23    Defendant filed a motion for a new trial in which he argued that the evidence was insufficient to find him guilty beyond a reasonable doubt of resisting or obstructing a police officer. During the hearing on the motion, defense counsel indicated that defendant was also asserting an ineffective assistance of counsel claim. After hearing arguments from both parties, the trial court denied the motion for a new trial. It did not address defendant's claim of ineffective assistance of counsel.

¶ 24    The matter then proceeded to a sentencing hearing and defendant was sentenced to the statutory minimum of two days in the Cook County Jail. This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26    On appeal, defendant raises numerous issues regarding the sufficiency of the evidence and the manner in which the trial was conducted. As we ultimately conclude that the evidence was insufficient to find him guilty beyond a reasonable doubt of obstructing a peace officer, we need not address the other issues raised in defendant's brief. Accordingly, we now turn to discuss defendant's main claim of error.

¶ 27    Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of obstructing a peace officer because it failed to establish that Officer O'Connor was engaged in an authorized act where his seizure of defendant lacked reasonable articulable suspicion.[2]

_____

[2]We note that, although the misdemeanor complaint charged defendant with obstructing and resisting, the parties agree that evidence at trial only went towards the obstruction of Officer O'Connor's investigation. Thus, we will refer to defendant's charge for "obstructing" and not resisting in this decision.

¶ 28    When a challenge is made to the sufficiency of the evidence at trial, we review to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31; *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In making this determination, we review the evidence in the light most favorable to the prosecution. *Baskerville*, 2012 IL 111056, ¶ 31. Accordingly, all reasonable inferences from the record in favor of the prosecution will be allowed. *People v. Bush*, 214 Ill. 2d 318, 326 (2005); *People v. Mehta*, 2020 IL App (3d) 180020, ¶ 14. When considering a challenge to the sufficiency of the evidence in a criminal case, we are mindful that our function is not to retry the defendant. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 29    Here, defendant was charged with obstructing a peace officer by failing to comply with Officer O'Connor's commands and by continuing to attempt to gain access to the trunk of his vehicle while Officer O'Connor was investigating defendant's possible criminal trespass. To establish obstruction of a peace officer, the State is required to prove the following elements: "(1) defendant knowingly obstructed a peace officer; (2) the officer was performing an authorized act in his official capacity; and (3) defendant knew he was a peace officer." *Baskerville*, 2012 IL 111056, ¶ 32; 720 ILCS 5/31-1(a) (West 2012). The statute requires that the officer must be engaged in an "authorized act within his [or her] official capacity." 720 ILCS 5/31-1(a) (West 2012); see *People v. Jones*, 2015 IL App (2d) 130387, ¶ 11. If the officer's conduct violated the fourth amendment, it is unauthorized, and the defendant, therefore, is not in violation of section 31-1(a). *Jones*, 2015 IL App (2d) 130387, ¶ 12. Thus, it follows that any conviction of that offense must be reversed. *People v. Borders*, 2020 IL App (2d) 180324, ¶ 33;

*People v. Slaymaker*, 2015 IL App (2d) 130528 ¶ 12.

¶ 30     We begin by addressing whether the evidence, viewed in the light most favorable to the State, sufficiently supports defendant's conviction of obstructing Officer O'Connor in his performance of an authorized act. Defendant asserts that Officer O'Connor lacked reasonable articulable suspicion to detain him—and therefore his actions were unauthorized—where there was no sign prohibiting entry onto the property, where the air pump was located and was accessible for public use, and where defendant's mere presence in the parking lot did not give rise to an articulable suspicion that he would burglarize the gas station. The State disagrees and responds that Officer O'Connor was engaging in an authorized act where he was investigating whether defendant was committing a trespass to private property. The State maintains that Officer O'Connor had reasonable articulable suspicion as the business was closed, it was 12:45 a.m., and the business had been burglarized in the past.

¶ 31     Both the United States and Illinois Constitutions guarantee citizens the right against unreasonable searches and seizures. U.S. Const. amends. IV, XIV; Ill. Const. 1970, art. I, § 6. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." *People v. Sanders*, 2013 IL App (1st) 102696, ¶ 13. However, our supreme court has recognized three types of police-citizen encounters that do not constitute an unreasonable seizure: (1) arrests, which must be supported by probable cause; (2) a brief investigative stop, also known as a "*Terry* stop" under *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) encounters that do not involve coercion or detention and therefore do not implicate fourth amendment interests. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006).

¶ 32     In the case at bar, the parties do not dispute that defendant was effectively seized when he was forbidden from opening the door to his vehicle and that Officer O'Connor was attempting to

conduct a *Terry* stop. In *Terry*, the United States Supreme Court held that "an officer may, within the parameters of the fourth amendment, conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity, and such suspicion amounts to more than a mere 'hunch.' " *People v. Gherna*, 203 Ill. 2d 165, 177 (2003) (citing *Terry*, 392 U.S. at 27). During a *Terry* stop, an officer may temporarily detain an individual for questioning where the officer reasonably believes the individual has committed, or is about to commit, a crime. *Terry*, 392 U.S. at 21-22. The *Terry* standard has been codified in section 107-14 of the Code of Criminal Procedure of 1963. 725 ILCS 5/107-14 (West 2012); *People v. Thomas*, 198 Ill. 2d 103, 109 (2001).

¶ 33　To justify a *Terry* stop, officers must be able to point to specific and articulable facts that, combined with the rational inferences from those facts, make the intrusion reasonable. *Sanders*, 2013 IL App (1st) 102696, ¶ 14; *People v. Rhinehart*, 2011 IL App (1st) 100683, ¶ 14. This requirement is necessary to prevent police from having absolute discretion to intrude into the lives of occupants of motor vehicles. *People v. James*, 44 Ill. App. 3d 300, 303 (1976); *People v. Vanderver*, 158 Ill. App. 3d 178, 180 (1987).

¶ 34　When determining whether an investigatory stop is reasonable, we rely on an objective standard and view the facts from the perspective of a reasonable officer at the time of the stop. *Sanders*, 2013 IL App (1st) 102696, ¶ 14. The officer must have observed unusual conduct, leading to a reasonable, articulable suspicion that the person has committed or is about to commit a crime. *People v. Kipfer*, 356 Ill. App. 3d 132, 137 (2005). "Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly." *Thomas*, 198 Ill. 2d at 110. "The facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere

hunch." *Id.* The facts also should not be viewed with analytical hindsight. *Id.* Instead, they should be considered from the perspective of a reasonable officer confronted with the situation. *Id.*

¶ 35    Here, Officer O'Connor testified that he found the vehicle suspicious due to the gas station's having previously been burglarized, the lateness of the hour (12:45 a.m.), and the vehicle being parked with two individuals sitting inside it in a dark area of the parking lot. This evidence merely amounts to a hunch. First, the State presented no evidence regarding the previous burglaries occurring at the gas station. Accordingly, even if there had been any previous burglaries in the area, we do not know when they occurred in relation to October 20, 2013, what time of day or night they occurred, if an automobile was used in the burglaries, the general description of the suspects, what area of the gas station was burglarized, or other details that would be relevant to provide articulable suspicion that defendant's vehicle could have been involved in such an offense. See *People v. Harris*, 2011 IL App (1st) 103382, ¶ 14 ("A conclusory and unsubstantiated statement that a location is a 'high crime area' is insufficient to establish that consideration for purposes of justifying a *Terry* stop."). Officer O'Connor presented no testimony that defendant was wearing dark clothing, was in possession of a bag or burglary tools, or otherwise appeared suspicious. In fact, when cross-examined, Officer O'Connor admitted that defendant had not been viewed physically outside of his vehicle doing anything of a suspicious nature. Furthermore, there was no testimony that the vehicle defendant was driving had been involved in any of the prior burglaries. See *People v. Beverly*, 364 Ill. App. 3d 361, 369 (2006) (the officers had not received any complaints about the defendant's vehicle).

¶ 36    Second, the lateness of the hour, without more, does not rise to reasonable articulable suspicion. In this regard, we find *Vanderver* to be instructive. In that case, the defendant's

vehicle was observed by police officers driving down a residential street at a slow rate of speed at 2:30 a.m. *Vanderver*, 158 Ill. App. 3d at 179. The automobile stopped to change direction in the parking lot of an apartment complex, which had been the scene of numerous vehicular thefts. *Id.* After an officer stopped the defendant, he observed burglary tools inside the vehicle, and the defendant was arrested for possession of burglary tools. *Id.* The trial court subsequently granted the defendant's motion to quash and suppress evidence, finding that there was no reasonable, articulable suspicion. *Id.* at 180. The reviewing court agreed, finding that "[t]hese are not facts which would give rise to a reasonably articulable suspicion of criminal activity, but rather at best amounts to a hunch." *Id.* at 181.

¶ 37    This case presents even fewer facts to support the State's claim that Officer O'Connor had a reasonable, articulable suspicion that defendant was committing a crime. Here, Officer O'Connor observed the vehicle parked in the parking lot of the gas station at 12:45 a.m. While in *Vanderver* the officer was assigned to patrol the apartment complex due to a rise of automobile thefts, here, we have no such testimony. As Officer O'Connor testified, he was merely conducting a routine after-hours business check—there was no testimony that he was assigned to patrol the gas station for burglars. Additionally, defendant's conduct (parking in a gas station parking lot and then attempting to leave the parking lot) does not in and of itself give rise to a reasonable, articulable suspicion of criminal activity. In fact, defendant presented a legitimate reason for being at the gas station—the vehicle was experiencing a mechanical issue, and he had Pajevic pull over into the gas station so he could examine the tires. See *Kipfer*, 356 Ill. App. 3d at 138-39 (the lateness of the hour "contributes to suspicion of criminal activity only when there is no legitimate basis for an individual to be in the location at such an hour"). The legitimacy of defendant's conduct is supported by the gas station owner's testimony. According to Dursun,

while the gas station was closed, the air pump remained operable and people could utilize the air pump after hours. Although Officer O'Connor testified the vehicle was not parked near the air pump, he also testified that he did not observe the vehicle pull into the gas station and therefore had no personal knowledge of what had occurred before he came upon the scene. In addition, no evidence was presented regarding the condition of defendant's vehicle or if Officer O'Connor had inspected the exterior of the vehicle. Our review of the evidence further reveals that the State failed to present any evidence that contradicted defendant's explanation that he pulled into the gas station due to a mechanical issue with the automobile.

¶ 38     We also observe that Officer O'Connor's testimony provides further indication that he lacked reasonable articulable suspicion. Specifically, Officer O'Connor admitted that he did not observe defendant doing anything of a suspicious nature outside the vehicle. He also admitted that he was not effectuating a traffic stop and did not care whether the vehicle was insured— indeed his request for defendant's driver's license and insurance information was merely "out of habit." Moreover, Officer O'Connor's actions did not demonstrate he was concerned whether defendant posed a threat to his safety. According to Officer O'Connor's testimony, he ran defendant's name through the LEADS database and determined that there were no warrants for his arrest. Officer O'Connor further testified that he was not affected by defendant's tone of voice or the threats that defendant made because, according to the officer, it "[h]appens all the time." Thus, after encountering defendant, Officer O'Connor failed to gather any additional evidence amounting to reasonable articulable suspicion that defendant was committing a crime.

¶ 39     The case law supports our determination that Officer O'Connor lacked reasonable, articulable suspicion. In *Kipfer*, a police officer stopped the defendant at about 3:30 a.m. after he observed the defendant come out from behind a dumpster and walk through the parking lot of an

apartment complex. *Kipfer*, 356 Ill. App. 3d at 134. The officer did not view the defendant do anything illegal, but the fact that automobile burglaries had recently occurred in the parking lot caused the officer to become suspicious. *Id.* The officer made several attempts to have the defendant stop before he complied. *Id.* at 138. The reviewing court found that the officer lacked a reasonable, articulable suspicion for the stop. *Id.* The defendant's presence in the parking lot at a late hour was not sufficient to create a reasonable suspicion that the defendant had committed or was about to commit a crime, and the officer failed to articulate any facts to distinguish the defendant from a resident of the apartment complex, a guest of a resident, or a mere passerby. *Id.* The reviewing court distinguished the case from ones in which the time of day and the location could give rise to a reasonable suspicion, such as where two men wearing black clothing were stopped after emerging from a commercial area at 12:50 a.m. *Id.* at 141 (citing *People v. McGowan*, 69 Ill. 2d 73, 75-76 (1977)).

¶ 40    *People v. Williams*, 2016 IL App (1st) 132615, also supports this decision. In that case, the defendant was parked in front of an abandoned building in a high-crime narcotics area, and the officer testified he wanted to verify what the defendant was doing at that location. *Id.* ¶ 47. The officer further testified that he had previously executed search warrants and made numerous narcotics arrests on the block where the defendant was located. *Id.* The reviewing court found that the officer's explanation did not point to specific and articulable facts that gave him a reasonable suspicion that defendant was committing, was about to commit, or had committed a crime. *Id.* The court further found that the defendant's "mere presence in the high-crime area, standing alone, was not sufficient to give the officers reasonable suspicion that he was engaged in criminal activity." *Id.*

¶ 41    Also instructive is *Beverly*, wherein the State appealed the trial court's decision to grant

the defendant's motion to quash and suppress evidence. *Beverly*, 364 Ill. App. 3d at 366. On appeal, the State that argued the defendant failed to satisfy his burden of demonstrating he was not doing anything unusual prior to his contact with the police. *Id.* at 369. The reviewing court disagreed and found that when the officers arrived, the defendant was parked in a parking spot in front of his aunt's apartment building, facing her balcony. *Id.* The defendant was sitting in the automobile in broad daylight for only 10 to 15 seconds before the officers parked behind him. Despite the fact that the apartment complex posted "no loitering" and "guest parking" signs, the officers acknowledged that such a short amount of time was not loitering, and it was possible one might not see the "guest parking" signs which were posted on the other side of the building. *Id.* In addition, there were empty parking spaces on either side of the defendant's vehicle, and no one had complained about the defendant's vehicle. *Id.* Thus, the reviewing court concluded that the defendant made a *prima facie* showing that he was doing nothing unusual when the officers approached him. *Id.* Here, a similar fact pattern occurred; defendant was parked in a parking lot (albeit in the middle of the night), where no "no trespassing" signs were visible on the property and no complaints had been made about his vehicle. The evidence established defendant was preparing to leave the gas station as the officer approached. The lateness of the hour and the conclusory statement that other burglaries had occurred at some point in time prior to October 20, 2013, do not serve to provide the officer with reasonable articulable suspicion that defendant was committing a crime.

¶ 42    In sum, we find the State's evidence at trial was insufficient as a matter of law on the second element of obstructing a peace officer and failed to prove any authorized act by Officer O'Connor. Specifically, the evidence failed to demonstrate that there was reasonable articulable suspicion present to warrant O'Connor's attempt to effect a *Terry* stop. Accordingly, Officer

O'Connor's actions were not authorized, and therefore, defendant was not obstructing an *authorized* act of a police officer. See *People v. Moore*, 286 Ill. App. 3d 649, 654 (1997) (stating that when a police officer approaches a person to make a *Terry* stop without sufficient articulable facts to warrant the stop, the officer's actions are not justified at the inception).

¶ 43                                    III. CONCLUSION

¶ 44     We conclude that the evidence in this case was insufficient to establish that Officer O'Connor was engaged in an authorized act, as required to support defendant's conviction for obstructing a peace officer. "If a court determines that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, the defendant's conviction must be reversed." *People v. Woods*, 214 Ill. 2d 455, 470 (2005). We therefore reverse the judgment entered on the verdict of guilty for obstruction of a peace officer and acquit defendant. Considering our determination, we need not address the parties' remaining arguments.

¶ 45     Reversed.

---

**No. 1-15-0354**

---

| | |
|---|---|
| **Cite as:** | *People v. Gallagher*, 2020 IL App (1st) 150354 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 13-MC5-005735; the Hon. Patrick T. Rogers, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas Hoff, and Emily E. Filpi, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Noah Montague, and Kelly Cunneen, Assistant State's Attorneys, of counsel), for the People. |

---